## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| Sean A. Regel, an individual, on behalf of himself and all others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>CAMPBELL SOUP COMPANY, a New Jersey Corporation; and SNYDER'S-LANCE, INC., a New York corporation,<br><br>Defendants. | Case No.<br><br>**CLASS AND COLLECTIVE ACTION COMPLAINT FOR:**<br><br>1. **Failure to Pay Overtime under the FLSA (29 U.S.C. § 207(a)(1))**<br>2. **Failure to Pay Overtime under the NYLL (N.Y. Lab. Law § 160)**<br>3. **Unlawful Deductions under the NYLL (N.Y. Lab. Law § 193)**<br>4. **Unlawful Deductions under the NYLL (N.Y. Lab. Law § 198-b(2))**<br>5. **Failure to Provide Notices Upon Hiring under the NYLL (N.Y. Lab. Law § 195(1))**<br>6. **Failure to Provide Wage Statements under the NYLL (N.Y. Lab. Law § 195(3))**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Sean A. Regel ("Plaintiff"), by and through his undersigned attorneys, hereby submits the following class action and collective action complaint against Campbell Soup Company and Snyder's-Lance, Inc. ("Snyder's-Lance," collectively "Defendants" or "Campbell Snacks"). The allegations concerning Plaintiff's acts and status are based upon his actual knowledge, and his allegations concerning all other matters are based upon information, belief, and the investigation of counsel:

## NATURE OF ACTION

1.      This action seeks to redress Defendants' systemic policy and practice of misclassifying their Distributor[1] employees as "independent contractors," resulting in a failure by Defendants to pay these employees overtime wages mandated by the Fair Labor Standards Act of 1938, 29 U.S.C. §§ 201 *et seq.* ("FLSA") and the New York Labor Law, N.Y. Lab. Law, Art. 19 §§ 650 *et seq.*, ("NYLL"). Defendants' misclassification of their Distributors also results in Defendants' making unlawful deductions from the wages of Distributors, as well as failing to provide adequate wage notices and wage statements under the NYLL §§ 193, 195, and 198.

2.      Defendant Campbell is a brand powerhouse with two divisions: Meals & Beverages and Snacks. Within its Snacks segment is Defendant Snyder's-Lance, which it acquired in 2018 and has owned and controlled since. Synder's-Lance and other brands make up Campbell's Snack division. Collectively, Defendants are one of the largest producers and distributors of snack foods in the United States.

3.      Campbell Snacks deploys an independent misclassification scheme to cheat its employees, its competition, and the state and federal governments. Campbell Snacks does so by willfully and systematically misclassifying its hundreds of delivery drivers as "Independent Contractors." In doing so, Campbell Snacks denies these Distributors, including the named Plaintiff, access to critical benefits and protections they are entitled to

---

[1] Distributors" are Campbell Snacks' direct-store-delivery workers who enter Distributor Agreements with Campbell Snacks and are classified by Campbell Snacks as independent contractors.

CLASS ACTION COMPLAINT

by law, such as minimum wage, overtime compensation, and indemnification for business expenses/deductions. Through its willful misclassification, Campbell Snacks also robs federal and state governments of tax revenue, causes losses to state unemployment insurance and workers' compensation funds, and gets an undue advantage over its law-abiding competition.[2]

4.      Campbell Snacks sells billions of dollars of snack food products to retailers throughout the United States. To help sustain its profits, Campbell Snacks has concocted a model where it advertises "independent contractor" distributor opportunities. As part of the model, Campbell Snacks requires each Distributor to purchase a specific sales territory in which the Distributor is supposedly going to purchase, take title to, re-sell, and distribute Campbell Snacks' snack food products to customers who are prearranged for the Distributor by Campbell Snacks. The Distributors pay large sums for the right to the "independent distributor" opportunity outlined in Campbell Snacks' advertisements and its Distributor Agreement.

5.      In short, Campbell Snacks sells the notion that these "independent contractors" will run and control their own sales-based business with their own customers for their own profit and gain. But Campbell Snacks never actually operates its business under these terms, despite Distributors' heavy investment and reliance on the promises Campbell Snacks makes.

---

[2] *See* U.S. Dept. of Labor, Wage and Hour Division, "Misclassification of Employees as Independent Contractors," available at https://www.dol.gov/whd/workers/Misclassification/ (describing the repercussions of misclassification) (last accessed June 10, 2024).

CLASS ACTION COMPLAINT

6.     In reality, the distributor role is far from "independent." For example, for the vast majority of product sales, Campbell Snacks itself contracts directly with its own large retailer customers (like Walmart, Target, and large convenience-store chains) and maintains title over the snack food products until the retailers take possession.  But in no case do Distributors ever actually receive title to products that go into Campbell Snacks' retail locations.[3] Instead, Campbell Snacks provides its product to Distributors on "consignment." Distributors merely deliver the product and stock Distributors' customers' shelves for a non-negotiable piece rate wage that Campbell Snacks unilaterally establishes.

7.     Campbell Snacks also dictates the set route or territory within which Distributors deliver. Campbell Snacks maintains control over that territory or route with respect to things like which Campbell Snacks' products will be available, price, shelf space, displays, and promotion. Worse still, Campbell Snacks determines which products Distributors may deliver (for which Distributors receive piece rate wages) and which products Campbell Snacks will directly ship to retailers from its warehouse (for which Distributors receive no piece rate wages). Often, the sole difference between the products carried by Distributors and those directly shipped by Campbell Snacks is the amount of wholesale product in the container (*e.g.*, Distributors carry a brand of crackers that comes in a container of twenty packages, while Campbell Snacks directly ships the same brand of

---

[3] As described in Campbell Snacks' Distributor Agreements, "the Products shall be delivered on consignment to Distributor by Snyder's-Lance on the terms and at the prices established, in writing, by Snyder's-Lance from time to time." Accordingly, Snyder's-Lance retains legal ownership of the products as the "consignor," whereas Distributors take no title to the products and receive a simple piece rate for their product deliveries as "consignees."

CLASS ACTION COMPLAINT

crackers but in containers of six packages).

8.     Campbell Snacks also unilaterally dictates when unsold snack food products must be reclaimed from retail locations (a.k.a. "stales" or stale product) as dictated by its retail customers and passed down to Distributors.

9.     Campbell Snacks also dictates which products and brands of goods will be sold within each territory. Notably, Campbell Snacks may, and does, elect to change which retailers it serves and/or which brands it will carry. This is true even where Campbell Snacks drastically devalues the Distributors' routes because Campbell Snacks unilaterally chooses to discontinue a certain brand or stop selling to a particular retailer within that route.

10.     Campbell Snacks also hires management and sales employees in each of its regions to carry out sales and to directly supervise and instruct the so-called "independent distributors" in performance of their distribution and merchandizing responsibilities within their routes.

11.     As such, rather than operating the sales-oriented independent business promised to them, Distributors carry out a vital portion of Campbell Snacks' direct-store-delivery ("DSD") business operations—delivering and merchandizing bakery products to Campbell Snacks' retail customers for a set piece rate wage.

12.     Plaintiff is a Distributor who entered into the Distributor Agreement with Campbell Snacks. Plaintiff brings this action on behalf of himself and other similarly situated Distributors. This hybrid action is brought both as a "collective" action under the Federal Labor Standards Act ("FLSA") as well as a class action under Rule 23 of the

Federal Rules of Civil Procedure based on numerous violations of New York law.

## **THE PARTIES**

13.    Plaintiff Sean A. Regel is an adult individual who, at all relevant times when he personally performed work as a Distributor for Campbell Snacks, was a resident of Westchester County in the state of New York. Plaintiff served as a "Distributor" from approximately 2007 through present.

14.    Plaintiff Regel is a covered employee within the meaning of the FLSA and NYLL.

15.    Plaintiff Regel's written Consent to Join form is attached hereto as **Exhibit A**.

16.    Plaintiff Regel, like other Distributors, consistently worked between 50 and 70 hours per week for Defendants. Yet, Plaintiff and other Distributors did not receive overtime wages.

17.    Furthermore, Plaintiff Regel, like other Distributors, has been subjected to and injured by Defendants' policy and practices of making unlawful deductions from the wages of Distributors and failing to reimburse ordinary business expenses. The exact nature of these deductions and non-reimbursements is described in detail herein.

18.    Defendant Campbell Soup Company is a New Jersey corporation with a principal business address at One Campbell Place, Camden, NJ 08103. On March 26, 2018, Campbell's announced that it completed the acquisition of Snyder's-Lance. Snyder's-Lance is a major part of its Snacks division.

19.    Defendant Snyder's-Lance, Inc., is a North Carolina corporation with a principal business address at One Campbell Place, Camden, NJ 08103. Synder's-Lance is the surviving company that merged with S-L Distribution, LLC, which is the entity to actually sign and enter the relevant independent contractor agreements with Plaintiffs and the putative class.

CLASS ACTION COMPLAINT

## JURISDICTION

20.    This Court has original subject-matter jurisdiction over Plaintiff's FLSA claims pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 216(b).

21.    In addition, the court has supplemental jurisdiction over Plaintiff's state-law class claims pursuant to 28 U.S.C. § 1367.

22.    This Court also has jurisdiction over the claims asserted in this action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d), because the aggregate claims of the Class exceed the sum or value of $5,000,000, the Class has more than 100 members, and diversity of citizenship exists between at least one member of the Class and Defendant.

23.    This Court has personal jurisdiction over Defendants because they do business in New York and in this District, and Plaintiff's claims against Defendants arise from their conduct in this District.

## VENUE

24.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because Plaintiff resides in this District, has distributed Defendants' snack products in this District, and because other substantial events giving rise to the claims occurred in this District.

## GENERAL ALLEGATIONS

### A.    Defendants' Direct-Store-Delivery Business Model

25.    Defendants use a "direct-store-delivery" ("DSD") model to deliver household brand snack products into large retail stores like Walmart and Target. An integral part of this DSD model involves Distributors like Plaintiff who pick up the snack food product at local warehouses and deliver them to the retail customers' shelves (*e.g.*,

CLASS ACTION COMPLAINT

the store delivery aspect of Defendants' DSD model).

26.    Campbell is a "focused brand powerhouse with two divisions: Meal & Beverages and Snacks." *See* https://www.campbellsoupcompany.com/about-us/. Part of Campbell's Snacks segment is Snyder's-Lance, which was acquired by Campbell on March 26, 2018.[4] Snacking represents approximately 47% of Campbell's $10.1 billion in annual net sales, approximately $4.7 billion. *See* Campbell Soup Company, Form 8-K, Exhibit 99.1, at 3, March 26, 2018.

27.    Campbell's wholly owned Snyder's-Lance "is a whole distributor of various snack food products manufactured by subsidiaries and affiliates" of Campbell. *See* https://www.snyderslanceibo.com/ (last viewed June 19, 2024). Further, Snyder's-Lance "also provides wholesale distribution services to a variety of unrelated snack food companies known as Partner Brands[.]" *Id.* These "Partner Brands" are typically Campbell products other than Snyder's.

28.    Campbell and Snyder's-Lance share managerial employees. For instance, Campbell's Vice President of Logistics, Brian Dubak, is also an authorized representative for Snyder's-Lance.

29.    Snyder's-Lance operates throughout the United States and internationally. https://www.campbellsoupcompany.com/newsroom/news/campbell-to-acquire-snyders-lance-inc-to-expand-in-faster-growing-snacking-category/. Its portfolio of product brands includes Snyder's of Hanover®, Lance®, Kettle Brand®, KETTLE® Chips, Cape Cod®,

---

[4] *See* https://www.campbellsoupcompany.com/newsroom/press-releases/campbell-completes-acquisition-of-snyders-lance/.

Snack Factory® Pretzel Crisps®, Pop Secret®, Emerald®, Late July®, Krunchers!®, Tom's®, Archway®, Jays®, Stella D'oro®, Eatsmart Snacks™, O-Ke-Doke®, Metcalfe's Skinny®, and other brand names along with a number of third-party brands. *Id.*

30.     On August 30, 2018, Campbell announced its vision to be a leading snacks company. To support this strategy, Campbell focused on the integration of Snyder's-Lance into Campbell's business operations. CAMPBELL SOUP COMPANY, FORM 10-K, September 27, 2018. This integration included the sharing of key learnings and best practices between Campbell and Snyder's-Lance, including integrating Snyder's-Lance supply chain and distributor model. CAMPBELL SOUP COMPANY, FORM 8-K, EXHIBIT 99.1, March 26, 2018. Accordingly, Campbell engaged Snyder's-Lance distributors to distribute its snack products. Furthermore, Campbell engages in the routine purchase and sale of Snyder's-Lance distributor routes in order to maintain and expand upon this DSD model. CAMPBELL SOUP COMPANY, FORM 10-K, September 24, 2020. Campbell also frequently makes large capital expenditures to optimize its DSD distribution model.

31.     Thus, in order to get valuable snack product to market, Defendants utilize the labor of Distributors, who transport Defendants' goods from Defendants' local warehouses to Defendants' retail customer shelves.

32.     Needing to satisfy their customers and to provide the services they want, Defendants exercise pervasive control over their Distributor workforce. For example, Defendants establish the terms and prices for the snack-food products, delivery windows and schedules, product inspection requirements, and Operating Guidelines which regulate

Distributor conduct.[5]

### B.    Defendants Misclassified Drivers

33.    Integral to Defendants' snack food empire, Defendants use the labor of Distributors, like Plaintiff and the Class he seeks to represent, to carry out snack-food delivery services for Defendant's third-party retail customers that include major grocery chains and convenience stores. Defendants label Distributors as "independent contractors." In short, these Distributors perform a central part of Defendants' snack-distribution business: the picking-up, carrying, and delivery of snack-food products to Defendants' customers. The work of Distributors is necessary to Defendants' snack-distribution business and is continuously performed for Defendants. Further, Snyder's-Lance holds itself out as a wholesale snack-foods distribution company. Distributors are naturally an essential component of Defendants' business model.

34.    Defendants strictly control and regulate Distributors. Defendants agree to allocate responsibility for, or otherwise codetermine, the essential terms and conditions of Distributors' employment. Distributors must follow the terms of Defendants' onerous Distributor Agreement, along with other written instructions from Defendants. Under these operating requirements and standards, Defendants exert control and direction on

---

[5] Campbell Snacks issues to its Distributors a document entitled "Suggested Operating Guidelines & Schedule of Charges." Campbell Snacks states the Suggested Operating Guidelines set forth: "(1) suggested guidance and observed best practices of other successful distributors which can be used by Distributor, at its discretion, in operating its business and executing sales and distribution to its customers in the Territory; (2) an overview of settlement and damaged product return procedures; (3) an overview of various charges that may be applicable from time to time as a result of Distributor's requests or interactions with Snyder's-Lance, Inc. ("Snyder's-Lance") and other miscellaneous information that Distributor may find useful."

Distributors in connection with the performance of their distribution services, both in contract and in fact. This control and direction includes, but is not limited to, the following:

a. Defendants issue to Distributors Suggested Operating Guidelines & Schedule of Charges which Distributors must acknowledge in writing. Therein, Defendants regulate Distributors' conduct, including detailing how Distributors must interact with customers, how Distributors must interact with Defendants, and the various charges Defendants may issue Distributors for their services.

b. Defendants deliver to Distributors on consignment snack food products under terms and prices that it unilaterally establishes. Defendants retain sole authority to modify these terms and prices at their discretion. Defendants may also negotiate a price for the snack-food product with their customers directly which Distributors must honor.

c. Defendants unilaterally establish the piece rate wages paid to Distributors for their services. Distributors are paid a single "blended" piece rate wage for all deliveries, regardless of product type and price.

d. Defendants establish the procedures by which Distributors must abide to place orders for snack-food products on consignment from Defendants.

e. Defendants establish the locations from which Distributors must pick up the snack-food products.

f.  Defendants establish the process by which Distributors must report missing or damaged products. Distributors must cooperate and provide support to Defendants in the investigation of any claim that a delivery by Defendants contains damaged or missing products.

g.  Defendants have the right to inspect products which have already been consigned to Distributors. Defendants may take possession of products consigned to Distributors upon 48 hours prior notice.

h.  Distributors must report their inventory to Defendants at least once a week, but in no case later than the deadline established by Defendants. Should a Distributor fail to make this weekly report as requested by Defendants, the Distributor may be charged for that week's shipment of products to the Distributor.

i.  Distributors must support and cooperate with Defendants in the case of a product recall.

j.  Distributors hold and care for the snack food products as the sole and exclusive property of Defendants, but take no title to the products. Distributors must store the products in such a manner as to protect them. However, upon delivery to a Distributor, the Distributor assumes the risk of loss, theft, or damage to the products.[6]

---

[6] This is, in essence, Campbell Snacks' consignment scheme, as described in Section C, *supra*. Campbell Snacks' Distributor Agreement explicitly states that the products remain Campbell Snacks' property, but offsets the risk of loss, theft, or damage to Distributors.

k.  Distributors must hold and care for the products of other Distributors in accordance with the Distributor Agreement.

l.  Distributors are obligated to use their "best efforts" to: (1) develop the full sales potential of the territory; (2) sell products to stores and retail outlets within the territory in accordance with the Distributor Agreement; (3) sell and promote the products to achieve the best result possible; (4) provide service to Defendants' customers in accordance with good industry practice and as requested Defendants' customers; and (5) maintain the established reputation and good will of the products in the marketplace.

m.  Distributors must comply with any policies, procedures, requests, and requirements imposed upon them by Defendants' customers. A Distributor wishing to change his or her delivery schedule must provide Defendants with at least fifteen days written notice.

n.  Defendants enter into contracts with retailers in order to stock their shelves with Defendants' products. When these contracts expire, only Defendants' representatives can negotiate and renew the contracts. If Defendant does not desire and/or act to renew the contract, the retail outlet is removed from the respective Distributor's territory.

o.  Defendants determine the amount of product retail stores must have in stock. Failure to meet Defendants' standards results in discipline to the Distributor. For some of their more valuable customers,

Defendants require multiple weeks of product in-stock at all times, which requires Distributors to disproportionately service those stores or risk termination.

p.  On occasion, Defendants' representatives ride along with Distributors as they service their respective territories in order to monitor Distributor performance and check-in on the retail outlets. This is known as a "market check."

q.  Defendants determine which products Distributors may carry, and which products they may not.

r.  Defendants determine the amount of shelf space devoted to products carried by Distributors. It may choose to promote Distributor-carried brands by increasing shelf space, or suppress Distributor-carried brands by reducing shelf space for those products.

s.  Defendants determine which products it will directly ship to retail outlets at the exclusion of Distributors, and which products Distributors may deliver and receive piece rate wages.

t.  Defendants determine whether the products carried by Distributors will be subject to promotions.

u.  Defendants maintain a record of the products carried by each Distributor. Should a Distributor's records show less product carried than Defendants' records, Defendants will place the extra product "in dispute." Unless the Distributor shows Defendants proof of the

14
CLASS ACTION COMPLAINT

product, Defendants will require the Distributor to pay them the amount of the extra product.

v.  Distributors may procure product only from Defendants unless Distributors produce to Defendants a receipt from where they procured their product. Should a Distributor not produce such a receipt, the product will be placed in "Inventory Reconciliation" and the Distributor will be unable to distribute the product.

w.  Defendants regulate the individuals whom Distributors hire to aid them in servicing the respective territories.

x.  Defendants require that Distributors incorporate, register, and license their franchises. Distributors are obligated to maintain their franchises for the duration of the Distributor Agreement. Distributors must also acquire and maintain an employer identification number and provide proof thereof to Defendants.

y.  Distributors must acquire and maintain all licenses and permits needed for conducting business, operating their vehicles, and performing under the Distributor Agreement. Distributors must provide proof of all such licenses and permits to Defendants.

z.  Distributors must electronically transmit records of their deliveries and any other transactions to Defendants in the specific format required by Defendants. If Distributors wish to use a hand-held computer system provided by Defendants to make this transmission,

CLASS ACTION COMPLAINT

they must do so pursuant to the terms and conditions established by Defendants.

aa. Distributors must keep accurate records of the products they receive, and sales and deliveries made (and other operations). Defendants may inspect such records two times per year, or more in exceptional circumstances.

bb. Distributors have five days to remedy any failure to meet the service requirements of Defendants' customers. If such failure is not remedied within five days, Defendants may deem the territory abandoned. Where a territory is abandoned, all rights under the Distributor Agreement revert to Defendants.

35. Defendants have the right to terminate the Distributor Agreement and a Distributor's rights with respect to the territory, upon 24 hours written notice, with no right to cure, after occurrence of any of the following:

a. Insolvency of the Distributor;

b. Dishonesty, fraudulent conduct, or misrepresentation by the Distributor;

c. Performance of the Distributor's duties while under the influence of alcohol or illegal drugs;

d. Involvement in any activity which is unsafe or is a health hazard to the public;

e. Conviction of the Distributor or any of his/her directors or officers of

16

CLASS ACTION COMPLAINT

any offense which is punishable by imprisonment or which is a felony;

f.  Any actions by the Distributor which cause, or Defendants believe are likely to cause substantial harm to (1) Defendants' business, goodwill or reputation in the territory or elsewhere; (2) the Distributor's business, goodwill or reputation; or (3) another Distributor's business, goodwill or reputation;

g.  Abandonment of the territory or a customer within the territory; and

h.  The failure to submit accurate and timely inventory reports.

36.    In the case of any other breach of the Distributor Agreement, Distributors have five days to cure such breach after which Defendants may terminate at their discretion.

37.    Defendants are not obligated to afford Distributors the right to cure a breach on more than three occasions during any consecutive 12-month period. Should a subsequent breach occur, Defendants may terminate the Distributor Agreement upon 24 hours' written notice without the right to cure.

38.    Defendants further have the right to terminate the Distributor Agreement and Distributors' rights thereunder for any undefined "just cause" that may arise upon giving sixty days prior written notice.

**C.    Defendants Deprive Distributors of Contractually Owed Wages**

39.    In order to purchase a distribution territory, a Distributor must enter into a Distribution Agreement with Defendants. The Distribution Agreement includes a boundary description and map of the Distributor's territory, as well as a list of retail outlets in their territory.

CLASS ACTION COMPLAINT

40.     Defendants issue product to Distributors on "consignment." When Distributors transport and stock retail outlets with the consigned product, Defendants pay Distributors a piece rate wage set by Defendants. This piece rate wage is the sole form of wages received by Distributors for their services to Defendants. Defendants may, and do, unilaterally change the piece rate wages received by Distributors.

41.     In this consignment model, Distributors never take title of the product; it remains Defendants' product at all times. Distributors do not purchase product from Defendants, nor sell product to third party retailers for a profit. Instead, Distributors are issued product by Defendants and deliver that product to Defendants' retail outlet customers on terms set by Defendants. Defendants establish a non-negotiable piece rate for Distributors, which Distributors receive for distributing the consigned product to retail outlets. The piece rate wage Distributors receive for distributing Defendants' product is a "wage," pursuant to NYLL § 190(1).

42.     Accordingly, through the Distribution Agreement, Distributors are contractually owed the piece rate wage on products distributed to retail outlets within their territory. Yet, Defendants routinely deprive Distributors of these wages.

43.     Defendants authorize which product stock keeping units (SKUs) Distributors may distribute to retail outlets. The SKU is determined by the type of product and volume of packaging.

44.     Defendants may, and do, directly ship product to retail outlets in Distributors' territories thereby bypassing the Distributor's role in getting the product to market. Direct shipping involves Defendants sending product directly from their warehouse to the retail

outlet, cutting the Distributor out of the process. When Defendants direct-ship a product with an SKU carried by Distributors, Defendants pay Distributors a reduced piece rate. However, when Defendants direct-ship a product with an SKU that is not carried by Distributors, Defendants pay Distributors no piece rate wages.

45.     Defendants arbitrarily and nominally change product SKUs so that they may direct ship the product without paying Distributors their piece rate. For example, Defendants will authorize Distributors to carry an SKU of cracker snacks that come in a container of twenty individually wrapped packages. Defendants will then generate a new SKU for the same cracker products that contains six individually wrapped packages. Similarly for bagged chips, Distributors will be authorized to carry 5.5 oz bags. Defendants then generate a new SKU of the same chips which come in 5 oz bags. Defendants will not authorize Distributors to carry this new SKU, and Defendants pay Distributors no piece rate on these direct shipments even though the same retail outlets are buying the same product, just packaged in a different quantity. Because the product is placed on the retail outlet shelves in their individual packaging, there is no discernible difference between the product carried by Distributors and the product directly shipped by Defendants apart from differing bar codes on the back of the product. The below photos depict product carried by Distributors and product directly shipped by Defendants. The products are indistinguishable. Yet, Distributors receive piece rate wages on some of these products and, by Defendants' whim, not on others. By arbitrarily creating new product SKUs so that Defendants may direct-ship product to retail outlets in Distributors' territories without paying Distributors their piece rate, Defendants deprive Distributors of their contractually

owed wages.

 

CLASS ACTION COMPLAINT

 

CLASS ACTION COMPLAINT



**D.    Defendants' Unlawful Deductions and Failure to Reimburse Business**

46.    Distributors pay for the right to work for Defendants. This includes, but is not limited to, paying a non-refundable "initial fee" to purchase a distribution territory, paying a weekly administrative service charge, paying a daily charge for temporary route service by Defendants, paying for manual invoice entries by Defendants, paying for sales ticket errors, paying a central-billed account fee for missing invoices, and paying a returned check fee.

47.    Distributors also shoulder many other unreimbursed business expenses for Defendants, including but not limited to vehicle related expenses like fuel/mileage,

clothing and uniforms, the computer system required to make mandatory electronic transmissions to Defendants of transactions, and insurance. Defendants are well aware of these expenses and they are reasonably necessary.

48.     Defendants' actions, as described above, result in Distributors being deprived of the contractually owed wages under their Distributor Agreement with Defendants.

**E.     Defendants' Failure to Comply with Other New York Wage and Hour Laws**

49.     As explained further below, as a result of their unlawful misclassification, Defendants fail to provide Distributors with overtime pay and fails to provide adequate wage notices and statements in violation of New York law.

## FLSA COLLECTIVE ACTION ALLEGATIONS

50.     Plaintiff brings the First Count below as a collective action under the FLSA on behalf of themselves and all similarly situated individuals. The proposed FLSA Collective Class ("FLSA Class") is defined as:

> a.   All persons who personally worked in New York pursuant to a "Distributor Agreement" or similarly styled hiring agreement to distribute Defendants' snack food products to their customers that were not classified as employees during the period commending three years prior to the commencement of this action through the close of the Court-determined opt-in period.

Plaintiff reserves the right to modify the definition prior to conditional certification of the FLSA Collective Action.

51.     To the extent tolling operates to toll claims by the FLSA Class against Defendants, the applicable statute of limitations and period for calculating damages should be adjusted

accordingly.

52.     Defendants are engaged in communication, business, and transmission throughout the United States and are, therefore, engaged in commerce within the meaning of Title 29 of the United States Code Section 203(b).

53.     Plaintiff has consented in writing to be a part of this action pursuant to Title 29 of the United States Code Section 216(b).

54.     Plaintiff and members of the FLSA Class are similarly situated in that they signed a Distributor Agreement or similar contract, have substantially similar job requirements, receive similar or identical pay, and were required to work under the same uniform conditions and systems.

55.     This action meets all prerequisites for the maintenance of a collective action under the FLSA. Also, the persons who comprise the FLSA Class exceed 100 persons and are therefore so numerous that the joinder of all such persons is impracticable and the disposition of their claims as a collective class will benefit the parties and the Court.

56.     Nearly all factual, legal, statutory, declaratory, and injunctive relief issues raised in this Complaint are common to the FLSA Class and will apply uniformly to every member of the FLSA Class.

57.     The representative Plaintiff will fairly and adequately represent and protect the interest of the FLSA Class, and has retained attorneys who are competent and experienced in similar litigation. There are no material conflicts between the claims of the representative Plaintiff and the members of the FLSA Class that would make collective treatment inappropriate. Counsel for the FLSA Class will vigorously assert the claims of the entire FLSA Class.

58.     Notice of this lawsuit should be sent to the FLSA Class and Plaintiff will move for this after filing this Complaint. These individuals are readily identifiable through Campbell

Snacks' records.

## CLASS ACTION ALLEGATIONS

59.     Plaintiff brings the Second through Sixth Counts below as a class action against Campbell Snacks pursuant to Rule 23 of the Federal Rules of Civil Procedure and pursuant to Campbell Snacks' many violations of New York state law. The proposed Rule 23 Class ("New York Class") is defined as:

> a.   All individuals who personally worked in New York during the Class Period pursuant to a "Distributor Agreement" or similarly styled hiring agreement to distribute Defendants' snack products to their customers that were not classified as employees during the period commencing six years prior to the commencement of this action through judgment.

Plaintiff reserves the right to amend the above Class and to add additional classes and subclasses as appropriate based on investigation, discovery, and the specific theories of liability, among other reasons.

60.     **Numerosity.** The potential members of the Class as defined are so numerous that joinder of all the members is impracticable. While the precise number of class members has not been determined, Plaintiff is informed and thereon believes that there are more than 300 individuals meeting the class definition. Defendant has access to data necessary to identify the members of the Class.

61.     **Adequacy of Representation.** The named Plaintiff is fully prepared to take all necessary steps to fairly and adequately represent the interests of the Class defined above. Plaintiff's attorneys are ready, willing, and able to fully and adequately represent the Class and individual Plaintiffs. Plaintiff's attorneys are highly experienced in employment class action

litigation. Plaintiff intends to prosecute this action vigorously.

62.    **Common Questions of Law and Fact.** There are predominant common questions and answers of law and fact and a community of interest amongst Plaintiff and the claims of the Class as follows:

      a.    The proper interpretation of the Distribution Agreement;

      b.    Whether Plaintiffs and the members of the Class were misclassified as independent contractors under New York law;

      c.    Whether Defendants' misclassification of Plaintiff and the Class as independent contractors was willful and/or intentional;

      d.    Whether Defendants' misclassification of Plaintiff and the Class as independent contractors was willful and/or intentional;

      e.    Whether deducting wages for various expenses from Plaintiff and the members of the Class's pay for ordinary business expenses was illegal; and

      f.    Whether Defendants provided Plaintiff and the Class with adequate wage notices and statements.

63.    **Typicality.** The claims of Plaintiff are typical of the claims of all members of the Class because Defendants applied and continues to apply their illegal pay practices uniformly to all employees.

64.    **Superiority of a Class Action.** Class action is superior to other available means for the fair and efficient adjudication of this controversy. Individual joinder of all members of the Class is not practicable, and questions of law and fact common to the Class has been damaged and is entitled to recovery due to Defendant's conduct described in this Complaint. A class action will allow those similarly situated to litigate their claims in the most efficient and economical manner

for the parties and the judiciary. Plaintiff is unaware of any difficulties likely to be encountered in this action that would preclude its maintenance as a class action.

### CLAIMS FOR RELIEF

**Count I – Failure to Pay Overtime under the FLSA**
**29 U.S.C. § 207(a)(1)**

65.    Plaintiff incorporates by reference every allegation contained above.

66.    Plaintiff brings this cause of action on behalf of himself and the FLSA Class.

67.    The FLSA (Section 207(a)(1)) requires overtime pay at a rate not less than one and one-half times an employee's regular rate for work over forty hours in a week.

68.    Defendants' Distributors, including Plaintiff, regularly worked (and continue to work) between 50 and 70 hours per week in accord with Defendants' mandated schedule. Yet Defendants never paid Plaintiff or any member of the FLSA Class any overtime pay.

69.    Defendants know that these Distributors are improperly classified and that they work well over 40 hours per week, but intentionally and willfully fail to provide overtime premium pay.

70.    Plaintiff and the FLSA Class are thus entitled to, and hereby seek, unpaid overtime for hours worked in excess of forty in a week, plus interest, liquidated damages, penalties, costs and attorney's fees as provided by the FLSA.

**Count II – Failure to Pay Overtime under the NYLL**
**N.Y. Lab. Law § 160 And NYCCRR 12 § 142-2.2**

71.    Plaintiff incorporates by reference every allegation contained above.

72.    Plaintiff brings this cause of action on behalf of himself and the New York Class.

73.     NYLL § 160 and the N.Y. Comp. Codes R. & Regs. ("NYCCRR") tit. 12, § 142-2.2 require employers to compensate their employees at a rate not less than one and one-half times their regular rates of pay, or one and one-half times the minimum wage rate, if greater, for any hours worked exceeding forty in a workweek.

74.     As described above, Defendants are employers within the meaning of the NYLL and NYCCRR, while Plaintiff and the members of the Class are employees within the meaning of the NYLL and NYCCRR.

75.     As also described above, Plaintiff and the members of the Class worked in excess of forty hours in a workweek, yet Defendants failed to compensate them in accordance with the NYLL's and NYCCRR's overtime provisions.

76.     Plaintiff and members of the Class are entitled to overtime pay for all hours worked per week in excess of forty at the rate of one and one-half times their regular rate of pay, or one and one-half times the minimum wage rate, if greater.

77.     Owing to their knowing or intentional failure to pay overtime wages to Plaintiff and the Class, Defendants cannot prove that they had a good faith basis to believe that their underpayment was in compliance with the law, and therefore Plaintiffs are owed liquidated damages equal to one hundred percent of the total of such underpayments pursuant to NYLL § 663.

78.     Plaintiff and members of the Class are also entitled to interest and attorneys' fees and costs for Defendants' violations of the NYLL's and NYCCRR's overtime provisions.

## Count III – Unlawful Deductions under the NYLL
## N.Y. Lab. Law § 193

79.    Plaintiff incorporates by reference every allegation contained above.

80.    Plaintiff brings this cause of action on behalf of himself and the New York Class.

81.    The unpaid wages at issue in this litigation are "Wages" as defined by NYLL § 190(1).

82.    Plaintiff and the Class members are "Employees" as defined by NYLL § 190(2).

83.    Defendants are an "Employer" as defined by NYLL § 190(3).

84.    Throughout the relevant period, Defendants were an employer obligated to comply with the NYLL's requirements, and Plaintiff and the New York Class members were covered employees entitled to the NYLL's protections.

85.    NYLL § 193 prohibits employers, among other things, from making deductions from or charges against the wages of an employee unless they are made in accordance with a law *or* regulation or expressly authorized in writing by the employee *and* the deductions are for the benefit of the employee.

86.    No statute or regulation authorizes the fees and charges Defendants extract from Plaintiff and the Class, and those deductions are not for the benefit of Plaintiff or the Class.

87.    Defendants, pursuant to their policy and practice, make unlawful deductions from or charges to the wages of its Distributors, including Plaintiff and the Class, for items

such as a non-refundable "initial fee" to purchase a distribution territory, paying a weekly administrative service charge, paying a daily charge for temporary route service by Defendants, paying for manual invoice entries by Defendants, paying for sales ticket errors, paying a central-billed account fee for missing invoices, and paying a returned check fee.

88.     Plaintiff and the Class are victims of uniform compensation, deduction, and business expense policies; and these uniform policies, in violation of the NYLL, have been applied, and continue to be applied, to all Defendants' Distributors.

89.     Owing to their knowing or intentional decision to make unlawful deductions, Defendants cannot prove that they had a good faith basis to believe that taking unlawful deductions was in compliance with the law, and therefore Plaintiffs are owed liquidated damages equal to one hundred percent of the total of such deductions pursuant to NYLL § 198.

90.     Plaintiff and the Class are also entitled to recover interest and reasonable attorneys' fees and costs.

## Count IV – Unlawful Deductions under the NYLL
### N.Y. Lab. Law § 198-b(2)

91.     Plaintiff incorporates by reference every allegation contained above.

92.     Plaintiff brings this cause of action on behalf of himself and the New York Class.

93.     The unpaid wages at issue in this litigation are "Wages" as defined by NYLL § 190(1).

94.     Plaintiff and the Class members are "Employees" as defined by NYLL §

190(2).

95.    Defendants are an "Employer" as defined by NYLL § 190(3).

96.    Throughout the relevant period, Defendants were an employer obligated to comply with the NYLL's requirements, and Plaintiff and the New York Class members were covered employees entitled to the NYLL's protections.

97.    NYLL § 198-B(2) prohibits persons, among other things, from requesting, demanding, or receiving, either before or after such employee is engaged, a return, donation, or contribution of any part or all of said employee's wages, salary, supplements, or other thing of value, upon the statement, representation, or understanding that failure to comply with such request or demand will prevent such employee from procuring or retaining employment.

98.    Defendants, pursuant to its policy and practice, requires Distributors to pay a contribution or fee from their wages for items such as a non-refundable "initial fee" to purchase a distribution territory, paying a weekly administrative service charge, paying a daily charge for temporary route service by Defendants, paying for manual invoice entries by Defendants, paying for sales ticket errors, paying a central-billed account fee for missing invoices, and paying a returned check fee.

99.    Plaintiff and the Class are victims of uniform compensation, deduction, and business expense policies; and these uniform policies, in violation of the NYLL, have been applied, and continue to be applied, to all Defendants' Distributors.

100.    Owing to their knowing or intentional decision to require their Distributors to make "kick-backs" prohibited by NYLL 198-b, Defendants cannot prove that they had

CLASS ACTION COMPLAINT

a good faith basis to believe that taking kick-backs from Distributors was in compliance with the law, and therefore Plaintiffs are owed liquidated damages equal to one hundred percent of the total of such kick-backs pursuant to NYLL § 198.

101.    Plaintiff and the Class are also entitled to recover interest and reasonable attorneys' fees and costs.

### Count V – Failure to Provide Notices Upon Hiring under the NYLL N.Y. Lab. Law § 195(1)

102.    Plaintiff incorporates by reference every allegation contained above.

103.    Plaintiff brings this cause of action on behalf of himself and the New York Class.

104.    The NYLL requires that employers provide employees, in writing in English and in the language identified by each employee as the primary language of such employee, at the time of  hiring, a notice containing the following information:  the rate or rates of pay and basis thereof, whether paid by the hour, shift, day, week, salary, piece, commission, or other;  allowances, if any, claimed as part of the minimum wage, including tip, meal, or lodging allowances;  the regular pay day designated by the employer;  the name of the employer;  any "doing business as" names used by the employer;  the physical address of the employer's main office or principal place of business, and a mailing address if different;  and the telephone number of the employer. NYLL § 195(1).

105.    Defendants have willfully failed to supply Plaintiff and members of the Class with an accurate Wage Notice as required by NYLL § 195.

106.    Defendants have no good faith justification or defense for failing to provide

CLASS ACTION COMPLAINT

the notice mandated by NYLL §§ 195.

107.    To the extent any notices were given to Plaintiff and the Class, they were inaccurate and misleading, since they failed to account for Plaintiff's unpaid wages.

108.    NYLL § 198(1-b) provides that Plaintiffs and the Class Members are entitled to recover $50.00 dollars for each workday following their tenth day of employment on which Defendants failed to provide the required wage notice up to of $5,000.00 each plus an award of costs and reasonable attorneys' fees incurred in pursuing this claim.

### Count VI – Failure to Provide Wage Statements under the NYLL
### N.Y. Lab. Law § 195(3)

109.    Plaintiff incorporates by reference every allegation contained above.

110.    Plaintiff brings this cause of action on behalf of himself and the New York Class.

111.    The NYLL requires that employers furnish each employee with a statement with every payment of wages, listing the following:  the dates of work covered by that payment of wages;  name of employee;  name of employer;  address and phone number of employer;  rate or rates of pay and basis thereof, whether paid by the hour, shift, day, week, salary, *piece*, commission, or other;  gross wages;  deductions;  allowances, if any, claimed as part of the minimum wage;  and net wages. For all employees who are not exempt from overtime compensation, the statement shall include the regular hourly rate or rates of pay;  the overtime rate or rates of pay; the number of regular hours worked, and the number of overtime hours worked. NYLL § 195(3).

112.    To the extent any notices were given to Plaintiff and the Class, they were

CLASS ACTION COMPLAINT

inaccurate and misleading, since they failed to account for Plaintiff's unpaid wages.

113.    During the Class Period, Defendants willfully violated NYLL § 195(3) by failing to supply Plaintiffs and the Class Members with a wage statement each pay period that includes their regular piece rate(s) of pay, their overtime rate(s) of pay, their number of regular hours worked, and their number of overtime hours worked.

114.    Defendants have no good faith justification or defense for failing to provide the notice mandated by NYLL §§ 195(3).

115.    NYLL § 198(1-b) provides that Plaintiffs and the Class Members are entitled to recover $50.00 dollars each time Defendants failed to provide them with the required wage statement in the last six years, plus periods of equitable tolling, up to a total of $5,000.00 each plus an award of costs and reasonable attorneys' fees incurred in pursuing this claim.

## PRAYER FOR RELIEF

Plaintiff prays for judgment against Defendant, as follows:

1.    Designation of this action as a collective action on behalf of the members of the FLSA Class and prompt issuance of notice pursuant to 29 U.S.C. § 216(b) to all similarly situated members of the FLSA Class, apprising them of the pendency of this action, permitting them to assert timely FLSA claims in this action by filing individual Consents to Sue pursuant to 29 U.S.C. § 216(b), and tolling of the statute of limitations;

2.    Certification of Plaintiffs' New York state law claims as a Class Action pursuant to Fed. R. Civ. P. 23 and prompt issuance of notice to class member

pursuant to Rule 23(c)(2);

3. Graning judgment in favor of Plaintiff and the members of the FLSA and New York Classes on all Counts;

4. An award of all compensatory damages due under the FLSA and New York law;

5. An award of liquidated and/or punitive damages as a result of the Defendants' willful failure to pay overtime compensation pursuant to the FLSA (*e.g.*, 29 U.S.C. § 216);

6. An award of all appliable penalties;

7. An award of pre-judgment and post-judgment interest where allowable;

8. An award of reasonable attorneys' fees and reimbursement of all costs and expenses incurred in litigating this action;

9. An award of reasonable attorneys' fees and reimbursement of all costs and expenses incurred in litigating this action;

10. An award of all available equitable and injunctive relief precluding the continuation of the policies and practices pled in this Complaint;

11. An award of any further relief this Court deems just, necessary, and proper.

Plaintiff, by and through his undersigned counsel, hereby demand a jury trial in the above-captioned matter.

Respectfully submitted,

Dated: August 29, 2024

**FINKELSTEIN,        BLANKINSHIP, FREI-PEARSON & GARBER, LLP**

By:    _/s/ D. Greg Blankinship_
D. Greg Blankinship (SBN DB1723)
One N. Broadway Suite 900
White Plains, NY 10601
Tel: (844) 431-0695
Email: gblankinship@fbfglaw.com

**NICHOLAS & TOMASELVIC, LLP**
Craig M. Nicholas (CA SBN 178444)*
Alex Tomasevic (CA SBN 245598)*
Shaun Markley (CA SBN 291785)*
Jordan Belcastro (CA SBN 339570)*
225 Broadway, 19th Floor
San Diego, California 92101
Tel: (619) 325-0492
Fax: (619) 325-0496
Email: cnicholas@nicholaslaw.org
Email: atomasevic@nicholaslaw.org
Email: smarkley@nicholaslaw.org
Email: jbelcastro@nicholaslaw.org

*Special Appearances to be Entered*

Attorneys for Plaintiffs