UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SEAN A. REGEL, *an individual, on behalf of himself and all others similarly situated*,

*Plaintiff*,

v.

CAMPBELL SOUP COMPANY, and SNYDER'S-LANCE, INC.,

*Defendant*.

No. 24-CV-6541 (KMK)

OPINION & ORDER

Appearances:

Alex M. Tomasevic, Esq.
Craig Nicholas, Esq.
Patsy Jordan Belcastro, Esq.
Shaun Markley, Esq.
Nicholas & Tomasevic, LLP
San Diego, CA
*Counsel for Plaintiff*

Douglas Gregory Blankinship, Esq.
Finkelstein, Blankinship, Frei-Pearson & Garber, LLP
White Plains, NY
*Counsel for Plaintiff*

Elisa Egonu, Esq.
Eric Michael Makinen, Esq.
Sari M. Alamuddin, Esq.
Morgan, Lewis & Bockius LLP
Chicago, IL
*Counsel for Defendants*

KENNETH M. KARAS, United States District Judge:

Sean A. Regel ("Plaintiff") brings this Action against Campbell Soup Company ("Campbell") and Snyder's-Lance, Inc. ("Snyder's-Lance," and collectively, "Defendants"), alleging violations of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201, et seq., and the

New York Labor Law ("NYLL") stemming from Defendants' purported misclassification of Plaintiff and a putative FLSA collective. (*See generally* Compl. (Dkt. No. 1).) Defendants contend they have properly classified the collective and bring a contingent counterclaim (the "Counterclaim") for unjust enrichment. (*See* Counterclaim (Dkt. No. 21).) Before the Court is Defendants' Motion for Summary Judgment (the "Motion") seeking the dismissal of Plaintiff's claims. (*See* Mot. for Summ. J. ("Mot.") (Dkt. No. 77).) For the reasons discussed below, the Motion is granted.

## I. Background

### A. Factual Background

The following facts are taken from the Parties' statements pursuant to Local Civil Rule 56.1, (*see* Rule 56.1 Statement ("Defs.' 56.1") (Dkt. No. 80); Response re: 56.1 Statement ("Pl.'s 56.1") (Dkt. No. 89); Rule 56.1 Statement ("Defs.' Counter 56.1") (Dkt. No. 95)), or other admissible evidence submitted by the Parties.[1] They are presented in the light most favorable to Plaintiff as the non-movant, and are not genuinely disputed unless stated otherwise.

Campbell's Company—of iconic red-and-white soup can fame—makes a good deal more than soup. *See, e.g.*, *Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*, 598 U.S. 508,

---

[1] Plaintiff's Rule 56.1 Statement, which was submitted as a "Counterstatement of Material Facts," (*see* Pl.'s 56.1), does not comply with Local Civil Rule 56.1 of the Local Rules of the United States District Courts for the Southern and Eastern Districts of New York ("Local Civil Rule 56.1"). Local Civil Rule 56.1(b) provides that: "The papers opposing a motion for summary judgment must include a correspondingly numbered paragraph admitting or denying, and otherwise responding to, each numbered paragraph in the statement of the moving party, and if necessary, additional paragraphs containing a separate, short and concise statement of additional material facts as to which it is contended that there exists a genuine issue to be tried." While the Court would be entitled, therefore, to deem all statements admitted, in the name of fairness the Court has not done so. *See Process Am., Inc. v. Cynergy Holdings, LLC*, No. 12-CV-772, 2014 WL 3844626, at *1 n.2 (E.D.N.Y. Apr. 30, 2014) (taking the same approach when faced with the same issue), *aff'd*, 839 F.3d 125 (2d Cir. 2016) (summary order).

538–39 (2023) (discussing artistic fair use of Campbell's soup cans). Its business is organized into two divisions, a Meals and Beverages division and a Snacks division. (Pl.'s 56.1 ¶ 1; Defs.' 56.1 ¶ 1.) Snyder's-Lance is an indirect, wholly owned subsidiary of Campbell, housed within the Snacks division. (Pl.'s 56.1 ¶ 2; Defs.' 56.1 ¶ 2.) Snyder's-Lance manufactures and markets a range of snack food products with mass appeal, from the spicy (Snyder's of Hanover Jalapeno Pretzel Pieces) to the tangy (Cape Cod Salt and Vinegar Chips) and even the sweet (Snyder's of Hanover Rounds, which are seasonal candy-covered round pretzels). (Pl.'s 56.1 ¶ 3; Defs.' 56.1 ¶ 3.) *See also* Snyder's of Hanover, https://www.snydersofhanover.com/ [https://perma.cc/3QPT-BCSD] (last visited August 11, 2026). Snyder's-Lance manufactures and markets these snacks and others wholesale; the subsidiary stores them in warehouses and other similar facilities around the country. (Pl.'s 56.1 ¶ 4; Defs.' 56.1 ¶ 4.)

Snyder's-Lance employs various methods to transport its products to stores, including contracting with product distributors. (Defs.' 56.1 ¶¶ 5–6; Pl.'s 56.1 ¶ 5.) These distributors contract with Snyder's-Lance and deliver the products to businesses. (Defs.' 56.1 ¶ 6; Pl.'s 56.1 ¶ 6.) These distributors are not required themselves to deliver, merchandise, or sell products to retail customers, and can hire employees or other distributors to provide these services. (Defs.' 56.1 ¶ 7; Pl.'s 56.1 ¶ 7 (declining to contest these assertions but instead stating that Plaintiff "has not used helpers on his route as using helpers is economically unfeasible due to margin rates set by" Snyder's-Lance); Decl. of Eric M. Makinen in Supp. of Mot. for Summ. J., ("Makinen Decl."), Ex. C ¶ 8 (Dkt. No. 79-3); Decl. of Jordan Belcastro ("Belcastro Decl."), Ex. 1, at

286:21–23 (Dkt. No. 90-1) (Plaintiff testifying, "You can hire an employee, of course. Would you make any money? I doubt it.").)[2]

Plaintiff is a distributor of Snyder's-Lance products, a role he began in 2007. (Defs.' 56.1 ¶ 8; Pl.'s 56.1 ¶ 8.) He works pursuant to a contract called a "Distributor Agreement" with Snyder's-Lance; that Agreement provides him with the exclusive right to sell and distribute certain Snyder's-Lance and other brands' products to retail stores in a specific geographic territory. (Defs.' 56.1 ¶ 8; Pl.'s 56.1 ¶ 8 (not contesting that the contract provides Plaintiff with these rights); Makinen Decl, Ex. L, at 2 (Dkt. No. 79-12) (copy of the operative agreement).) It appears that the terms of these agreements are not generally negotiable by distributors. (Belcastro Decl., Ex. 2, at 143:8–143:12 (Dkt. No. 90-2) ("Q. Are distributors allowed to or do they negotiate any of the specific terms of their written distributor agreements before signing them? A. No.").) Plaintiff and other distributors make their money as a percentage of the revenue on the product that is delivered to retail stores within their delivery route. (Defs.' Counter 56.1 ¶ 110; Belcastro Decl., Ex. 2, at 142:4–143:11 (describing a distributor's earnings as their "percentage of margin based on the deliveries made to stores" and stating that the speaker was not aware of any ability of the distributor to negotiate these margins before signing a distributor agreement).) Distributors do not set the wholesale price or the price paid by a retailer, unless the retailer pays cash, in which case the distributor can adjust the price. (Belcastro Decl., Ex. 2, at 140:2–22.)

---

[2] The Parties dispute the percentage of sales that are delivered via the distributor system, (*compare* Pl.'s 56.1 ¶ 104 *with* Defs.' Counter 56.1 ¶ 104), but this dispute is immaterial to the disposition of the instant Motion.

Plaintiff purchased the Snyder's-Lance distribution rights within his territory from another individual, Mike Gecox, in 2007. (Defs.' 56.1 ¶ 11; Pl.'s 56.1 ¶ 11.) Plaintiff negotiated the purchase price for the distribution route from Gecox, and paid $168,000. (Defs.' 56.1 ¶¶ 13–14; Pl.'s 56.1 ¶¶ 13–14.) In a deposition, Plaintiff testified that an individual from Snyder's-Lance was involved in the purchase arrangement in terms of "get[ting] [Plaintiff] the paperwork" and serving as a "go-between" for Plaintiff, Gecox, and Snyder's-Lance, but further explained that it was up to him and Gecox to set a fair price for the purchase. (Makinen Decl., Ex. A, at 116:25–117:5 (Dkt. No. 79-1).) Of the $168,000 purchase price, $145,000 was memorialized in an Agreement of Sale dated July 20, 2007. (Pl.'s 56.1 ¶ 15; Defs.' 56.1 ¶ 15.) Plaintiff made a $14,000 cash payment and financed the remaining $131,000, then separately agreed to pay Gecox an additional $23,000 in cash for the territory. (Pl.'s 56.1 ¶¶ 15–16; Defs.' 56.1 ¶¶ 15–16.) Regel testified that he thought the purchase was a "good investment," and saw opportunities to profit, as he believed Gecox "had a lot of issues" including that he "wasn't servicing stores." (Pl.'s 56.1 ¶¶ 17–18; Defs.' 56.1 ¶¶ 17–18.)

After he had serviced the route for a few years, on June 29, 2009, Regel agreed to sell the rights to two retailers within his territory—A&P, also known as Food Emporium, and Dan's Supreme Key Food. (Pl.'s 56.1 ¶ 21; Defs.' 56.1 ¶ 21.) Pursuant to Plaintiff's deposition testimony, Snyder's-Lance "was pushing to restructure routes," such that it could "create another route" using some of the retailers that were within Plaintiff's territories. (Belcastro Decl., Ex. 1, at 132:16–20.) Accordingly, Plaintiff "sold a couple of stops" along his route "with another distributor" to create the route. (*Id.* at 132:21–133:9.) He explained that he felt pressure from the company to carry out the sale, and that this pressure motivated his decision to sell. (*Id.* at 133:18–134:6.) He sold this portion of his route for $20,000, an amount that he represents

reflected a standard rate at the time of sale, and put that money toward the loan that he had taken out, although he could have chosen to keep the money or use it as he desired. (*Id.* at 135:13–136:23; Pl.'s 56.1 ¶¶ 21, 24; Defs.' 56.1 ¶¶ 21, 24.) Plaintiff admits that the buyer could have tried to negotiate the price further, but Plaintiff was unwilling to reduce the price further. (Pl.'s 56.1 ¶ 22; Defs.' 56.1 ¶ 22.)

On June 5, 2011, Plaintiff sold the remainder of his distribution territory back to Snyder's-Lance for $150,803.00. (Pl.'s 56.1 ¶ 25; Defs.' 56.1 ¶ 25.) Plaintiff attests that he sold as a result of Snyder's-Lance's restructuring, at which point he was "forced into selling territory," because Snyder's-Lance thought that, due to its own growth, the routes "would be too big," and it needed to restructure all the routes. (Belcastro Decl., Ex. 1, at 156:12–18.) With the $150,803.00 from the sale, Plaintiff paid off the balance of his earlier loan from Snyder's-Lance; $44,157.60 was used as a down payment on another distribution territory from Snyder's-Lance; and Plaintiff was paid out the remaining $15,000. (Pl.'s 56.1 ¶ 26; Defs.' 56.1 ¶ 26.)

On June 6, 2011, Plaintiff bought the aforementioned new distribution territory, spanning the Bronx and Upper Manhattan, from Snyder's-Lance for $108,015.00. (Pl.'s 56.1 ¶¶ 27, 47; Defs.' 56.1 ¶¶ 27, 47.) As mentioned, $44,157.60 was paid out from the proceeds of the sale of Plaintiff's original distribution territory; the remaining $64,495.97 was financed through a loan from Banc of America Leasing & Capital, LLC. (Pl.'s 56.1 ¶¶ 27, 47.) In the years since 2011, Plaintiff paid off his Banc of America loan and now owns his distribution territory free and clear. (Pl.'s 56.1 ¶ 28; Defs.' 56.1 ¶ 28.)

Under the terms of the distributor agreement that accompanied the new distribution territory (the "New Distributor Agreement"), Plaintiff agreed to certain terms. (*See* Pl.'s 56.1 ¶ 36; Defs.' 56.1 ¶ 36.) Among other things, the New Distributor Agreement explained that the

parties to that agreement intended to "create an independent contractor relationship between them." (Pl.'s 56.1 ¶ 37; Defs.' 56.1 ¶ 37.) The New Distributor Agreement also permitted Plaintiff to choose the "manner, means, and methods by which [he] achieves [the required] results," including setting his own "schedule, hours worked, sequence of . . . work, . . . breaks . . . , vehicles and equipment . . . ," and allowed him to "engag[e] in any other business or profession or selling or distributing any other products" he would so choose. (Pl.'s 56.1 ¶¶ 38–39; Defs.' 56.1 ¶¶ 38–39.) He was also at liberty to terminate the New Distributor Agreement without cause, and at liberty to sell the right to distribute within the territory to another individual. (Pl.'s 56.1 ¶¶ 40–41; Defs.' 56.1 ¶¶ 40–41.) In contrast, Snyder's-Lance could terminate the New Distributor Agreement only under certain circumstances described in that agreement, such as Plaintiff's insolvency, fraudulent conduct, use of alcohol or illicit drugs while performing duties under the New Distributor Agreement, or conviction of a felony. (Defs.' 56.1 ¶ 43; Pl.'s 56.1 ¶ 43; Makinen Decl., Ex. L, at 15.)

Plaintiff attests that no one at Snyder's-Lance has ever given him a delivery schedule, or required him to submit a proposed schedule for approval on a regular basis. (Defs.' 56.1 ¶ 44–45; Pl.'s 56.1 ¶ 44–45.) However, Plaintiff testified that he is expected to meet Snyder's-Lance's expectations as to the deliveries being satisfactory. (Pl.'s 56.1 ¶ 44.) Specifically, Plaintiff explains that based on a store's sales volume, he needs to make a certain minimum number of trips to the store per week, both to provide service to the customers' "in accordance with good industry practice and as requested by its customers" which is an obligation he has under the New Distribution Agreement, and to avoid "discipline." (Pl.'s 56.1 ¶ 46.) As explained further in note 6, *infra*, however, all the materials before the Court suggest that these minimum numbers of trips were set forth in non-binding guidance from Snyder's-Lance. Regardless, the trips to stores

along the route must be carried out during store receiving hours[3] and, Plaintiff testified, there are also some scheduled stops on his route. (Pl.'s 56.1 ¶ 46.) The scheduled stops are set by the retailers, not Snyder's-Lance. (Defs.' 56.1 ¶ 53; Pl.'s 56.1 ¶ 53.) Additionally, if Plaintiff fails to make the stops to service large retail outlets along his route, he says he would be sent a breach letter, which would result in his termination. (Decl. of Jordan Belcastro in Supp. of Opp'n, Ex. 1, at 291:3–23.)

Plaintiff is free to purchase additional territories from other distributors if those territories come up for sale; nevertheless, Plaintiff has not acquired additional territories as, in his view, they are not worth the investment, being "too small" to make them financially viable and "overpopulated" by delivery people. (Defs.' 56.1 ¶¶ 29, 31; Pl.'s 56.1 ¶¶ 29, 31.) Plaintiff also explains that he selected and purchased his own vehicles for his delivery work; in 2019 he purchased an Isuzu NQR box truck, which was 16 feet in length, on the understanding that he was required to use a truck at least 16 feet in length for his work under the Snyder's-Lance agreement, though the Agreement does not contain any such requirement. (Defs.' 56.1 ¶ 33; Pl.'s 56.1 ¶ 33; Decl. of Jordan Belcastro in Supp. of Opp'n, Ex. 1, at 76:16–77:21.) He selected the vehicle for its reliability, and he chose to purchase the vehicle new rather than used for similar reasons. (Pl.'s 56.1 ¶ 33 (admitting these were factors in his decision).) Sometimes, he uses his personal pickup truck for deliveries, in part for convenience and in part to reduce fuel costs. (Defs.' 56.1 ¶¶ 61–62; Pl.'s 56.1 ¶¶ 61–62.) And while Plaintiff acknowledges that he was free to engage in other distribution arrangements under the terms of the New Distribution

[3] A store's "receiving hours" are the time period when a retailer's receiving department is open and orders can be delivered to the store. (Defs.' 56.1 ¶ 49; Pl.'s 56.1 ¶ 49.) Retailers set their own receiving hours, and Snyders-Lance does not set those hours. (Defs.' 56.1 ¶ 49; Pl.'s 56.1 ¶ 49.)

Agreement, he explained that he was unaware of any distributors that did, in fact, distribute products for other companies. (Defs.' 56.1 ¶ 39; Pl.'s 56.1 ¶ 39.) Plaintiff has never sold his territory, despite having the right under the New Distribution Agreement to do so, because he "likes what he does." (Defs.' 56.1 ¶ 42 (alteration adopted); Pl.'s 56.1 ¶ 42.)

On a typical workday, Plaintiff gets to his truck by around 3:00 AM. (Defs.' 56.1 ¶ 48; Pl.'s 56.1 ¶ 48.) He begins his route in the North Bronx, where a store has very early receiving hours. (Defs.' 56.1 ¶ 48; Pl.'s 56.1 ¶ 48.) Plaintiff adopted this route because it allowed him to save money on fuel and so that he can meet the schedules of the customers. (Defs.' 56.1 ¶ 50; Pl.'s 56.1 ¶ 50.) Because Plaintiff has developed positive relationships with some of the store staff, he is able to make at least one stop on his route earlier than the store's receiving hours. (Defs.' 56.1 ¶¶ 51–52; Pl.'s 56.1 ¶¶ 51–52.) His largest customer is Chefs' Warehouse, where his delivery appointment is usually set for 6:30 AM. (Defs.' 56.1 ¶¶ 53–54; Pl.'s 56.1 ¶¶ 53–54.) Plaintiff usually arrives to Chefs' Warehouse at 3:30 AM in order to avoid waiting for other vendors to complete their deliveries, even though he is unable to deliver the merchandise until the store's regular receiving hours. (Defs.' 56.1 ¶ 54; Pl.'s 56.1 ¶ 54.) He makes decisions on a week-by-week basis about whether to make weekend trips to stops on his delivery route, based on what is happening in the store, and specifically based on sales. (Defs.' 56.1 ¶ 57; Pl.'s 56.1 ¶ 57.) By Plaintiff's own admission, the decisions he makes as to "prioritiz[ing] the customers" on his route reflect the skills he has developed in time management over his time working for Snyder's-Lance. (Defs.' 56.1 ¶¶ 58–59; Pl.'s 56.1 ¶¶ 58–59.) Plaintiff also decides which customers he prioritizes, and works to service those stores with large sales volume to increase his own profit. (Defs.' 56.1 ¶ 60; Pl.'s 56.1 ¶ 60.) Although this is not part of Plaintiff's regular

business practice, he also alters his plans on the fly to meet customers' needs, and does so without approval from Snyder's-Lance. (Defs.' 56.1 ¶ 63; Pl.'s 56.1 ¶ 63.)

On Wednesdays, after his Chefs' Warehouse delivery, Plaintiff returns to the Snyder's-Lance warehouse to determine his order for the next day. (Defs.' 56.1 ¶ 55; Pl.'s 56.1 ¶ 55.) After returning to the warehouse on Wednesdays, Plaintiff does not do additional deliveries, as he has determined that the additional effort to make these deliveries is "not worth it" given where Snyder's-Lance's warehouse is located vis-à-vis his distribution territory in the Bronx. (Defs.' 56.1 ¶ 56; Pl.'s 56.1 ¶ 56.) Plaintiff claims that "he and the other distributors" all follow this practice of not making further deliveries after traveling to the product warehouse. (Pl.'s 56.1 ¶ 56.)

At least some customers of Snyder's-Lance have access to an electronic system called "Global Works," which allows customers to report issues with a distributor's performance first to the independent distributor and, if the issue remains unaddressed, it can be escalated to managerial staff at Snyder's-Lance. (Decl. of Jordan Belcastro in Supp. of Opp'n, Ex. 2, at 122:2–126:25.) However, neither Party cites any material suggesting that any of the customers on Plaintiff's route use this system, let alone that they have escalated any complaints to managers in a way that affected Plaintiff's work. (*See generally* Defs.' Mem.; Pl.'s Opp'n.) Additionally, customers sometimes share expectations with Snyder's-Lance that the company then "send[s] or forward[s] to the independent distributor," and that the distributor is obligated to meet these expectations under their distributor agreement with Snyder's-Lance. (Decl. of Jordan Belcastro in Supp. of Opp'n, Ex. 2, at 79:22–80:21.)

In terms of the pretzels, chips, and other products that Plaintiff delivers, he does not receive the Snyder's-Lance products outright; instead, Plaintiff and other distributors primarily

acquire them "on consignment," meaning that the distributor does not pay for the product, but earns their margin at the time the product is delivered to stores. (Pl.'s 56.1 ¶ 6; Belcastro Decl., Ex. 2, at 102:23–103:21; *see also* Belcastro Decl., Ex. 1, at 256:13–257:25 (explaining that the consignment model was introduced when Campbell acquired Snyder's-Lance, whereas before distributors would have to pay for unsold product, and that technically distributors have the option to pay for the product outright, an option referred to as "cash on delivery," but that Plaintiff did not consider this option economically viable as it required a lot of up-front cash from the distributor).) Plaintiff places the orders himself, though at times Plaintiff says that he was "forced product" in the form of cases added to his order that he did not request, and that he has been unsuccessful in pushing back against the inclusion of these cases in his orders. (Defs.' 56.1 ¶ 65; Pl.'s 56.1 ¶ 65; Belcastro Decl., Ex. 1, at 266:15–267:14).) No one from Snyder's-Lance reaches out on a weekly basis to tell Plaintiff what to order, however. (Defs.' 56.1 ¶ 67; Pl.'s 56.1 ¶ 67 (not contesting this component of the statement).) Plaintiff discerns which products are "best sellers" at individual stores to increase his profits under Defendants' consignment program. (Defs.' 56.1 ¶ 66; Pl.'s 56.1 ¶ 66; *see also* Belcastro Decl., Ex. 1, at 256:11–257:25 (explaining that technically distributors have the option to pay for the product outright, an option referred to as "cash on delivery," but that Plaintiff did not consider this option economically viable given the up-front expenditure, and so he and other distributors use the consignment program).) Plaintiff's orders are also influenced by "planograms," essentially blueprints of grocery store shelves where the placement of each item is determined. (Defs.' 56.1 ¶ 69; Pl.'s 56.1 ¶ 69 (not contesting this component of the statement).) The planograms are not determined by Plaintiff; it is contested whether they are solely retailer decisions or if Snyder's-Lance discusses planogram requirements in contracts with retailers. (Defs.' 56.1 ¶ 70; Pl.'s 56.1

¶¶ 69–70.) However, some store managers allow Plaintiff to deviate from established planograms. (Defs.' 56.1 ¶¶ 71–72; Pl.'s 56.1 ¶¶ 71–72 (not contesting this component of the statement).) Plaintiff has been able to convince some store managers to provide him with additional sales space beyond that Snyder's-Lance has paid for, which increases his profit. (Defs.' 56.1 ¶ 73; Pl.'s 56.1 ¶ 73.) Plaintiff says that he does this because Snyder's-Lance has "failed to acquire adequate space," and he wants to maximize sales potential, as he is required to do under his Agreement with Snyder's-Lance. (Pl.'s 56.1 ¶ 73.) Plaintiff picks up the products from a warehouse, to which he has 24/7 access. (Defs.' 56.1 ¶ 68; Pl.'s 56.1 ¶ 68.)

To further maximize the profitability of his route, Plaintiff goes to additional stores in his territory which are not already contracting with Snyder's-Lance, asking whether they are interested in his service; this has permitted Plaintiff to add some additional stores to his territory, though he has needed to obtain approval from his manager to see if Snyder's-Lance would be willing to pay for shelf space at those stores, if those are stores that require payment. (Defs.' 56.1 ¶ 76; Pl.'s 56.1 ¶ 76; Belcastro Decl., Ex. 1, at 143:21–144:11 (explaining that some stores require payment for space, while others do not, albeit while expressing that the latter category was rare).) In the event that stores were added to Plaintiff's territory, Plaintiff did not have to pay Snyder's-Lance any additional fee. (Defs.' 56.1 ¶ 77; Pl.'s 56.1 ¶ 77 (not contesting this point).) At times, Plaintiff was able to decide to stop servicing a store because it was no longer profitable for his business, though for larger stores he needed Snyder's-Lance's permission. (Defs.' 56.1 ¶ 78; Pl.'s 56.1 ¶ 78; Belcastro Decl., Ex. 1, at 146:15–148:7.) Plaintiff has some ability to set prices with at least some cash customers, though he appears not to do so. (Defs.' 56.1 ¶ 79; Pl.'s 56.1 ¶ 79.)

Plaintiff also had the option to operate as a sole proprietorship or a corporation for much of the time he worked for Defendants, though he says that he was eventually forced to form an LLC through which to operate his distributorship. (Defs.' 56.1 ¶¶ 82–83; Pl.'s 56.1 ¶¶ 82–83.) He eventually terminated the LLC and/or possibly "never finished the process" of corporate formation "at all" because Snyder's-Lance stopped inquiring about it. (Defs.' 56.1 ¶ 83; Pl.'s 56.1 ¶ 83; Belcastro Decl., Ex. 1, at 63:6–64:12 (Plaintiff explaining that he never finished the LLC formation process).)

Plaintiff communicated with his primary contact at Snyder's-Lance about once a month, and spoke with other Snyder's-Lance employees or the company on the telephone rarely. (Defs.' 56.1 ¶¶ 87–88; Pl.'s 56.1 ¶¶ 87–88 (not contesting that Plaintiff testified that telephone communications were rare).) In contrast, Plaintiff explains that he would average one or two text messages a week from store personnel, though he had a practice of deleting these messages immediately after responding to them, and so they are not in the record; he would email with Chefs' Warehouse employees. (Defs.' 56.1 ¶ 89; Pl.'s 56.1 ¶ 89.)

It is undisputed that the profitability of Plaintiff's territory has gradually increased over the time he has owned the route, and the territory now averages approximately $16,200 in weekly sales. (Defs.' 56.1 ¶¶ 92–93; Pl.'s 56.1 ¶¶ 92–93.) The increase in sales has increased the value of the distribution territory and, pursuant to his IRS Form 1099, as of 2024 he earns income of approximately $167,947.68 on the route. (Defs.' 56.1 ¶¶ 94–96; Pl.'s 56.1 ¶¶ 94–96.) These forms do not reflect Plaintiff's cash sales to customers in his territory. (Defs.' 56.1 ¶ 97; Pl.'s 56.1 ¶¶ 97.)

B. Procedural Background

Plaintiff commenced this Action on August 29, 2024. (*See* Compl.) On November 12, 2024, Defendants filed their Answer and Counterclaim. (*See* Ans. (Dkt. No. 21).)

On December 18, 2024, the Court set a briefing schedule on a Motion to Dismiss Defendants' Counterclaim filed by Plaintiff. (*See* Dkt. (minute entry dated Dec. 18, 2024).) After briefing on the Motion to Dismiss, on September 25, 2025, the Court denied Plaintiff's request. *See generally Regel v. Campbell Soup Co.*, No. 24-CV-6541, 2025 WL 2733840 (S.D.N.Y. Sept. 25, 2025).

On October 9, 2025, Defendants filed the instant Motion along with a supporting Memorandum of Law. (*See* Mot.; Mem. of L. in Supp. re: Mot. for Summ. J. ("Defs.' Mem.") (Dkt. No. 78).) On November 17, 2025, Plaintiff filed his Memorandum of Law in Opposition. (*See* Mem. of L. in Opp'n re: Mot. for Summ. J. ("Pl.'s Opp'n") (Dkt. No. 88).) On December 15, 2025, Defendants filed their Reply. (*See* Defs.' Reply Mem. of L. in Supp. of Mot. for Summ. J. ("Defs.' Reply") (Dkt. No. 94).)

## II. Discussion

A. Standard of Review

Summary judgment is appropriate where the movant shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (same); *Psihoyos v. John Wiley & Sons, Inc.*, 748 F.3d 120, 123–24 (2d Cir. 2014) (same). "In deciding whether to award summary judgment, the court must construe the record evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor." *Torcivia v. Suffolk County*, 17 F.4th 352, 354 (2d Cir. 2021); *see also Horror Inc. v. Miller*, 15 F.4th 232,

240 (2d Cir. 2021) (substantially same). "It is the movant's burden to show that no genuine factual dispute exists." *Vt. Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004); *see also Red Pocket, Inc. v. Interactive Commc'ns Int'l, Inc.*, No. 17-CV-5670, 2020 WL 838279, at *4 (S.D.N.Y. Feb. 20, 2020) (same).

"However, when the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the non[-]movant's claim," in which case "the non[-]moving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *CILP Assocs., L.P. v. Pricewaterhouse Coopers LLP*, 735 F.3d 114, 123 (2d Cir. 2013) (alteration adopted, citation and quotation marks omitted). Further, "[t]o survive a [summary judgment] motion . . . , [the non-movant] need[s] to create more than a 'metaphysical' possibility that his allegations were correct; he need[s] to 'come forward with specific facts showing that there is a genuine issue for trial,'" *Wrobel v. County of Erie*, 692 F.3d 22, 30 (2d Cir. 2012) (emphasis omitted) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986)), "and cannot rely on the mere allegations or denials contained in the pleadings," *Guardian Life Ins. Co. v. Gilmore*, 45 F. Supp. 3d 310, 322 (S.D.N.Y. 2014) (quotation marks omitted); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009) ("When a motion for summary judgment is properly supported by documents or other evidentiary materials, the party opposing summary judgment may not merely rest on the allegations or denials of his pleading.").

"On a motion for summary judgment, a fact is material if it might affect the outcome of the suit under the governing law." *Royal Crown Day Care LLC v. Dep't of Health & Mental Hygiene*, 746 F.3d 538, 544 (2d Cir. 2014) (quotation marks omitted). At this stage, "[t]he role

of the court is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried." *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011) (quotation marks omitted). Thus, a court's goal should be "to isolate and dispose of factually unsupported claims." *Geneva Pharms. Tech. Corp. v. Barr Laby's. Inc.*, 386 F.3d 485, 495 (2d Cir. 2004) (quoting *Celotex*, 477 U.S. at 323–24).

When ruling on a motion for summary judgment, a district court should "consider only evidence that would be admissible at trial." *Latimer v. Annucci*, No. 21-CV-1275, 2023 WL 6795495, at *3 (S.D.N.Y. Oct. 13, 2023) (citing *Nora Beverages, Inc. v. Perrier Grp. of Am., Inc.*, 164 F.3d 736, 746 (2d Cir. 1998)). "[W]here a party relies on affidavits or deposition testimony to establish facts, the statements 'must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.'" *DiStiso v. Cook*, 691 F.3d 226, 230 (2d Cir. 2012) (quoting Fed. R. Civ. P. 56(c)(4)); *see also Sellers v. M.C. Floor Crafters, Inc.*, 842 F.2d 639, 643 (2d Cir. 1988) ("Rule 56 requires a motion for summary judgment to be supported with affidavits based on personal knowledge . . . ."); *Baity v. Kralik*, 51 F. Supp. 3d 414, 419 (S.D.N.Y. 2014) (disregarding "statements not based on [the] [p]laintiff's personal knowledge"); *Flaherty v. Filardi*, No. 03-CV-2167, 2007 WL 163112, at *5 (S.D.N.Y. Jan. 24, 2007) ("The test for admissibility is whether a reasonable trier of fact could believe the witness had personal knowledge." (citation omitted)).

"As a general rule, 'district courts may not weigh evidence or assess the credibility of witnesses at the summary judgment stage.'" *Parker v. Fantasia*, 425 F. Supp. 3d 171, 183 (S.D.N.Y. 2019) (quoting *Jeffreys v. City of New York*, 426 F.3d 549, 551 (2d Cir. 2005)); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986) (noting that at the summary

judgment stage, the court is not to "weigh the evidence and determine the truth of the matter"); *Vital v. Interfaith Med. Ctr.*, 168 F.3d 615, 622 (2d Cir. 1999) ("Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment." (quotation marks omitted)). Where, however, the evidence presents "a question of 'he said, she said'" the court "cannot . . . take a side at the summary judgment stage." *Fincher v. Depository Tr. & Clearing Corp.*, 604 F.3d 712, 726 (2d Cir. 2010) (quoting *Simpri v. City of N.Y.*, No. 00-CV-6712, 2003 WL 23095554, at *8 (S.D.N.Y. Dec. 30, 2003)); *see also Kassel v. City of Middletown*, 272 F. Supp. 3d 516, 535 (S.D.N.Y. 2017) (noting that "it is not the role of the [c]ourt at summary judgment to resolve [a] factual clash"); *Bale v. Nastasi*, 982 F. Supp. 2d 250, 258–59 (S.D.N.Y. 2013) (stating that "where each side . . . tells a story that is at least plausible and would allow a jury to find in its favor, it is for the jury to make the credibility determinations and apportion liability, and not for the court"). And, even if the non-movant's evidence is "thin, [a non-movant's] own sworn statement is adequate to counter summary judgment." *Scott v. Coughlin*, 344 F.3d 282, 290–91 (2d Cir. 2003) (holding that "[t]he credibility of [the plaintiff's] statements and the weight of contradictory evidence may only be evaluated by a finder of fact"); *Gunn v. Milani*, No. 20-CV-2681, 2024 WL 4124319, at *6 (S.D.N.Y. Sept. 9, 2024) (same).

## B. Analysis

### 1. Governing Law under the FLSA

The FLSA defines an employee as "any individual employed by an employer," 29 U.S.C. § 203(e)(1), a definition that the Second Circuit has appropriately described as "circular[.]" *Saleem v. Corp. Transp. Grp., Ltd.*, 854 F.3d 131, 139 (2d Cir. 2017). The Second Circuit has therefore elaborated that the "determination of whether an employer-employee relationship exists

for purposes of the FLSA should be grounded in 'economic reality rather than technical concepts,' determined by reference not to 'isolated factors, but rather upon the circumstances of the whole activity.'" *Id.* at 140 (quoting *Barfield v. N.Y.C. Health & Hosps. Corp.*, 537 F.3d 132, 141 (2d Cir. 2008)) (alterations adopted). The Second Circuit has further articulated a multi-factor test to aid in determining a plaintiff's status as either an employee or an independent contractor under the FLSA, referred to as the "economic reality" test. *Saleem*, 854 F.3d at 139. The factors for the economic reality test are:

> (1) the degree of control exercised by the employer over the workers,
> (2) the workers' opportunity for profit or loss and their investment in the business,
> (3) the degree of skill and independent initiative required to perform the work,
> (4) the permanence or duration of the working relationship, and
> (5) the extent to which the work is an integral part of the employer's business.

*Barfield*, 537 F.3d at 142. "The 'ultimate concern' behind these factors 'is whether, as a matter of economic reality, the workers depend upon someone else's business for the opportunity to render service or are in business for themselves.'" *Franze v. Bimbo Bakeries USA, Inc.*, 826 F. App'x 74, 76 (2d Cir. 2020) (summary order) (quoting *Brock v. Superior Care, Inc.*, 840 F.2d 1054, 1059 (2d Cir. 1988)).[4] "No one of these factors is dispositive; rather, the test is based on a totality of the circumstances." *Brock*, 840 F.2d at 1058–59.

---

[4] As discussed heavily throughout this Opinion, the facts of *Franze* are extremely similar to the undisputed facts underlying the instant Motion. Of course, since *Franze* is a summary order, it does not constitute binding precedent. *See* 2d Cir. R. 32.1.1(a) (precedential effect of summary orders) ("Rulings by summary order do not have precedential effect."). But courts nevertheless "'consider summary orders for their persuasive value, and often draw guidance from them in later cases.'" *Force v. Facebook, Inc.*, 934 F.3d 53, 66 n.21 (2d Cir. 2019) (quoting *Brault v. Soc. Sec. Admin., Comm'r*, 683 F.3d 443, 450 n.5 (2d Cir. 2012)); *see also Anwar v. Fairfield Greenwich Ltd.*, 884 F. Supp. 2d 92, 97 (S.D.N.Y. 2012) (explaining summary orders provide "persuasive authority to the extent that their factual patterns align with the instant case and their reasoning is compelling"). As explained further throughout, the Court is not convinced by Plaintiff's argument, (Pl.'s Opp'n 25 n.2), that *Franze* was wrongly decided;

2. Employee Status under the FLSA

Whether a party is an employee or an independent contractor is a question of law that can be decided on summary judgment based on undisputed material facts. *See generally Saleem*, 854 F.3d 131 (affirming district court summary judgment decision finding that plaintiffs are independent contractors as a matter of law). Accordingly, the Court considers whether, based on the undisputed facts, no reasonable juror could conclude that Plaintiff was an employee of Defendants.

a. Degree of Control

The first factor, the degree of control exercised by the employer over the workers, strongly suggests that Plaintiff is an independent contractor.[5] Like the plaintiffs in *Franze*, Plaintiff "controlled the overall scope of [his] delivery operations," as demonstrated by his

---

its conclusion follows naturally from much of the Second Circuit's analysis in *Saleem*, 854 F.3d 131, a precedential opinion by which this Court is bound.

[5] In his briefing, Plaintiff urges that a 2021 case from the Western District of North Carolina, *Mode v. S-L Distrib. Co.*, No. 18-CV-00150, 2021 WL 3921344 (W.D.N.C. Sept. 1, 2021), considering whether there were common issues of fact such that a class of distributors should remain certified, "support[s]" the conclusion that Defendant had "control" over Plaintiff's work. (Pl.'s Opp'n 13.) Plaintiff effectively asks the Court not only to follow the reasoning of *Mode*, but also to adopt and follow certain factual findings made in *Mode*. (*Id.* at 13–14.) The Court is not at liberty to do so. *E.g.*, *In re Terrorist Attacks on Sept. 11, 2001*, No. 03-MD-1570, 2024 WL 4268663, at *2 (S.D.N.Y. Jan. 5, 2024) ("[C]ourts cannot take judicial notice of factual findings made in another case and rely on them for the truth of the matter asserted." (quotation marks omitted)), *report and recommendation adopted*, 2024 WL 1312504 (S.D.N.Y. Mar. 26, 2024). Further, this decision is from outside the Second Circuit—meaning the district court was not bound by precedents such as *Saleem*—and was made in the context of a class action certification rather than a motion for summary judgment. As a result, the Court is both disinclined to adopt *Mode*'s reasoning over on-point Second Circuit authority, and (unlike the Western District of North Carolina) not at liberty to depart from *Saleem*. *See Roth v. Smugglers' Notch Resort*, No. 25-CV-00112, 2026 WL 239453, at *3 (D. Vt. Jan. 29, 2026) (declining to rely on "[t]he cases cited by moving" party, as they were "at a different procedural stage than the instant case"); *Archer v. TNT USA, Inc.*, 12 F. Supp. 3d 373, 376 (E.D.N.Y. 2014) ("Decisions from outside the Second Circuit are not controlling on this Court.").

ability to "purchase additional territories" and "sell [his] territor[y] to other" distributors. 826 F. App'x at 76. *See also Barfield*, 537 F.3d at 144 (considering, among other factors, that the defendant "supervised and controlled . . . employees' on-site work schedules and conditions of employment"). Significantly too, Plaintiff retained "the ability to hire others to run the business," a factor that, the Second Circuit has instructed, reflects the "considerable independence and discretion" usually afforded to independent contractors. *Franze*, 826 F. App'x at 77; *see also Saleem*, 854 F.3d at 143 (considering, in concluding that the plaintiffs were independent contractors, that "some [of the p]laintiffs who owned franchises chose not to drive at all and, instead of letting their franchises lie dormant, permitted other individuals to drive for them"). Notably, and unlike prior cases considered by the Second Circuit, Plaintiff was not required to sign a non-compete provision; this fact also suggests that Plaintiff was an independent contractor. *Contra Franze*, 826 F. App'x at 77 (explaining, in dicta, that if there were "fewer facts demonstrating [the putative employer's] lack of influence over [the workers'] businesses, the non-compete clause[] . . . []might be of more consequence."); *see also Saleem*, 854 F.3d at 141 ("[A] company relinquishes control over its workers when it permits them to work for its competitors."); *Cox v. German Kitchen Ctr. LLC*, No. 17-CV-6081, 2023 WL 8648839, at *6 (S.D.N.Y. Dec. 14, 2023) (concluding the first factor weighed against employer status where the plaintiff was "not require[d] . . . to clock in or out" nor "mandate[d] . . . [to] take lunch breaks," employer "did not set a minimum or maximum time allotment for work hours," and the plaintiff "was not subject to a non-compete agreement or any related form of restriction"); *Carpenter v. Pepperidge Farm, Inc.*, No. 20-CV-3881, 2023 WL 4552291, at *9 (E.D. Pa. July 14, 2023) (substantially same), *aff'd*, No. 23-2372, 2024 WL 2103257 (3d Cir. May 10, 2024) (non-precedential order). Plaintiff also communicates directly with the customers

along the route while, so far as the record shows, he does not communicate particularly frequently with Snyder's-Lance or its employees and appears virtually never to communicate with Campbells and its employees. (Defs.' 56.1 ¶¶ 87–89; Pl.'s 56.1 ¶ 87–89.) *Contra Agerbrink v. Model Serv. LLC*, 787 F. App'x 22, 23–24, 25–26 (2d Cir. 2019) (summary order) (explaining that there existed a material fact as to the control factor where the putative employer "set[] her appointment schedule for the work week ahead, email[ed] [the plaintiff] her daily schedule a day in advance, and communicat[ed] directly with [the customer] if [the plaintiff] was running late to an appointment"); *cf. Velu v. Velocity Exp., Inc.*, 666 F. Supp. 2d 300, 307 (E.D.N.Y. 2009) (considering as part of independent contractor analysis that "[c]lients contact [the p]laintiff directly when they require his services").

Nor was Plaintiff beholden to a work schedule set by Defendants: he had "no minimum-hour requirements," and instead was "free to set [his] weekly schedule[], subject only to designated pickup and delivery times based on . . . customer requirements." *Franze*, 826 F. App'x at 77. Plaintiff has exercised this ability to set his own schedule by, among other things, optimizing his route to avoid traffic and improve productivity, as well as deciding not to work on Wednesday afternoons due to the traffic-heavy location of the Snyder's-Lance warehouse. (Defs.' 56.1 ¶¶ 47–48, 55–59; Pl.'s 56.1 ¶¶ 47–48, 55–59.) This fact weighs heavily in favor of independent contractor status. "[S]chedule flexibility," has been "singled out" by the Second Circuit "as a factor weighing in favor of independent contractor status because setting one's own hours demonstrates a lack of control by the putative employer and initiative on behalf of the worker." *Franze*, 826 F. App'x at 77.

To the extent that Plaintiff attempts to suggest that the nature of the working conditions inherently required him to work certain hours, and therefore effectively dictated a schedule for

him, (*e.g.*, Pl.'s 56.1 ¶ 56; Pl.'s Opp'n 10), this argument is unavailing. First, where "the very nature of [a] [P]laintiff's work" was the thing "that obliged him" to structure his time in a certain manner; this is not a fact that weighs in favor of employer status. *Sellers v. Royal Bank of Canada*, No. 12-CV-1577, 2014 WL 104682, at *6 (S.D.N.Y. Jan. 8, 2014), *aff'd*, 592 F. App'x 45 (2d Cir. 2015) (summary order); *see also Cox*, 2023 WL 8648839, at *5 (reasoning the same as to work that "entailed scheduling and attending appointments with customers").[6] As the

---

[6] While Plaintiff urges that Defendants have established the number of stops on his route in such a way that he must "work long hours, so that it is impracticable to work elsewhere," he does not point to evidence in the record sufficient to introduce a dispute of material fact as to whether his route is structured in a way that renders outside employment impracticable. *Franze v. Bimbo Foods Bakeries Distribution, LLC*, No. 17-CV-3556, 2019 WL 2866168, at *6 (S.D.N.Y. July 2, 2019) (wholly quoting United States Department of Labor Wage and Hour Division Advisory Opinion FLSA2019-6 (April 29, 2019), at 5)). (*Compare* Pl.'s Opp'n at 2 ("The [New Distributor Agreement] dictates the when and how of Plaintiff's work, compelling him to meet Snyder's' expectations." (alterations adopted and quotation marks omitted) *with* Decl. of Jordan Belcastro, Ex. 1, at 237:23–238:5 (material cited in support of aforementioned part of opposition brief, stating that no one from Snyder's-Lance ever set a schedule of the order of deliveries, acknowledging that this was up to Plaintiff, and Plaintiff stating that he had to "meet Snyder's' expectations" and explaining "it's dollar amount by how many times a week you service a store[,] [s]o figure out how to do it").) So, even assuming that this fact alone could overcome the other "degree of control" factors that are present here, Plaintiff has not demonstrated a dispute of material fact as to the amount of time that it takes to complete his work for Defendants, and whether that time would preclude him from working elsewhere. (*See also* Decl. of Jordan Belcastro, Ex. 4, at 1 (Dkt. No. 90-4) (document cited by Plaintiff to establish supposedly mandatory conditions of work, that expressly acknowledges that it contains "suggested guidance which can be used by Distributor, at its discretion, in operating its Territory"); *id.* at 5 ("suggest[ing] that all Distributors comply with" a delivery frequency schedule "in order to maximize their weekly sales and income"); Decl. of Eric M. Makinen in Supp. of Mot. for Summ. J., Ex. L, at 6 (record material cited by Plaintiff in support of alleged mandatory delivery frequency, but which obligated contracting distributor simply to "use its best efforts: (i) to develop the full sales potential of the Territory; (ii) to sell Products to Authorized Outlets and other stores and retail outlets . . . in accordance with this Agreement; (iii) to sell and promote the Products to achieve the best results possible; (iv) to provide service to Distributors' customers in accordance with good industry practice and as requested by its customers; and (v) to maintain the established reputation and good will of the Products in the marketplace").) *Cf. Kinney v. Artist & Brand Agency LLC*, No. 13-CV-8864, 2015 WL 10714080, at *4, 7, 14 (S.D.N.Y. Nov. 25, 2015) (explaining that the plaintiff introduced sworn testimony that he worked for one defendant for about 50 hours per week, from approximately 9:00 AM until

delivery windows were overwhelmingly set by the customers and passed along by Defendants to Plaintiff, (*e.g.*, Defs.' 56.1 ¶¶ 48–49; Pl.'s 56.1 ¶¶ 48–49), no reasonable juror could conclude that the requirements of these customers constituted a decision by *Defendants* to dictate Plaintiff's schedule; after all, "merely pass[ing] along information or requests from customers" "does not count as control by" the employer, at least, not without additional facts not present here, *Carpenter*, 2023 WL 4552291, at *5. *See also Velu v. Velocity Exp., Inc.*, 666 F. Supp. 2d 300, 307 (E.D.N.Y. 2009) (concluding that the plaintiff was an independent contractor where, among other things, neither "[the d]efendant nor its agents supervise [the p]laintiff's work," the "[p]laintiff may work for other companies while continuing his relationship" with the putative employer, even if the plaintiff "has not chosen to avail himself [of] the opportunity," and the "[p]laintiff has a great deal of control over his own work and work schedule, subject to the demands of clients").[7] Second, Plaintiff himself acknowledged in his deposition testimony that

---

approximately 7:00 PM, another for similar hours, and noting that the exclusivity resulting from these hours supported the existence of a dispute of material fact as to the first factor), *report and recommendation adopted*, 2016 WL 1643876 (S.D.N.Y. Apr. 22, 2016). And in any event, it is undisputed that Plaintiff could sell off stops if those stops were creating untenably long working hours. (*E.g.* Defs.' 56.1 ¶ 80; Pl.'s 56.1 ¶ 80.) *See Franze*, 2019 WL 2866168, at *6 (relying on the fact that the plaintiffs "controlled the size and scope of their territories, and they could buy and sell portions of distribution rights").

[7] Plaintiff contends that "Defendants exert immense control" over his and other distributors' work, as they "control the retail customer relationship," "negotiate terms with the major retailer customers," and work on things like chain pricing and promotional information. (Pl.'s Opp'n 9.) However, the Second Circuit has already rejected the argument that these facts support an employment relationship as opposed to an independent contractor relationship when combined with the other facts present here, and the Court is persuaded by its reasoning. *Franze*, 826 F. App'x at 77–79 (affirming district court decision holding that the distributor plaintiffs were independent contractors because, among other factors, the plaintiffs "were free to set their weekly schedules, subject only to the designated pickup and delivery times . . . and customer requirements" and rejecting the argument that, the defendant's "bargaining power with larger customers" weighed in favor of plaintiffs being employees because the "overall value of [the distributors'] businesses primarily depended on their own business judgment and foresight" particularly in light of the "ability to solicit new (albeit smaller) customers" (quotation marks

the decisions he has made—to not take on delivery of competitors' products, or purchase another route and hire assistants to run both routes at the same time—was "[his] assessment of" the costs and "[his] own business decision not to do that." (Decl. of Jordan Belcastro, Ex. 1, at 185:11–186:9.)[8] This concession effectively gives away the ball game: Plaintiff himself admits that these are business decisions he is making, not outcomes necessitated by his New Distributor Agreement or even the nature of the work.[9]

Although not determinative, the Court notes that a host of other facts in the record are suggestive of independent contractor status on the first factor, too. Defendants never trained

---

omitted)); *see also Carpenter*, 2024 WL 2103257, at *3 (concluding that distributors were independent contractors even though the defendant company provided distributors with "customer-created 'planograms' showing where to place products in certain retail stores," "require[d] them to use a particular handheld computer . . . to connect . . . to [the defendant's] inventory system," and "communicated to one [p]laintiff customer requests regarding store displays").

[8] In his deposition testimony, Plaintiff explained that under his initial distributor agreement, he was apparently not allowed to keep other product in his truck, and he was not aware whether this policy had changed. (Decl. of Jordan Belcastro, Ex. 1., at 181:25–182:14.) When referred to the operative New Distributor Agreement, which expressly permits him to distribute competitors' products, he expressed the view that he was still not allowed to carry those products in the same truck, but could not explain the basis for that belief, except that at some point he was told that he could not do so, "maybe five years ago," though he was unsure of the timeline. (*Id.* at 182:15–183:16.)

[9] To the extent that Plaintiff argues that the Defendants' setting the wholesale and chain customer pricing compels the conclusion that Defendants were Plaintiff's employers, (*see* Pl.'s Opp'n 8–9), via analogy to *Vasquez v. NS Luzury Limousine Service, Ltd.*, 2021 WL 1226567, at *1–2 (S.D.N.Y. Mar. 31, 2021), the analogy fails. In *Vasquez*, the plaintiffs worked "as personal drivers for two families," with the choice to receive hourly compensation or work on commission based on a flat rate paid by the families. *Vasquez*, 2021 WL 1226567, at *1. Their schedules effectively required being on call for 10 hours a day for the families, starting around 7:30 AM, for five days a week, and, the plaintiffs attested, eventually increased to additional work. *Id.* at *2. This schedule gave them only occasional opportunities to drive other customers, and they were contracted specifically to drive the families (*i.e.*, there is no reason to think they could subcontract with other drivers). *Id.* at *1–3. The difference between this arrangement—flat commission payment for work that precluded them from taking on virtually any additional customers, and which did not appear to afford the plaintiffs the liberty to rely on other workers—stands in stark contrast to the facts already described here.

Plaintiff. (Defs.' 56.1 ¶ 86; Pl.'s 56.1 ¶ 86 (admitting that Plaintiff testified that he never received any company training, but nevertheless maintaining that Regel's ride-along with Gecox constituted training and that he "was supposed to receive training" from Snyder's-Lance but never received it).) *Cf. Saleem*, 52 F. Supp. 3d at 538 (considering, as fact weighing against independent contractor status, that drivers received a "single, two-hour training session"). Nor is there any evidence that Defendants disciplined Plaintiff, even despite his deviation from retailer planograms and decisions to stop servicing retailers along his route. (Defs.' 56.1 ¶¶ 71, 78, 81; Pl.'s 56.1 ¶¶ 71, 78, 81 (admitting that Plaintiff did sometimes deviate from planograms and stop servicing retailers, and that he never received a breach letter).) *Cf. Brock*, 840 F.2d at 1060 (holding regular supervision, express reservation by employer of the right to supervise, and workers' awareness of employer "checks" and "regular review" were suggestive of employee status); *Chavez-Deremer v. CE Sec. LLC*, No. 21-CV-57, 2026 WL 643271, at *14 (E.D.N.Y. Mar. 6, 2026) (explaining that the defendants' regular discipline of the plaintiffs was "an obvious sign of control"); *Franze*, 2019 WL 2866168, at *7 (considering that defendant sent plaintiff's "breach letters" when they fell out of "compliance with the terms of the agreement"). Finally, the Parties expressly agreed to an independent contractor relationship between them—an agreement that, although not dispositive of the analysis here, further reinforces the Court's conclusion on the first factor. (*See* Defs.' 56.1 ¶ 37; Pl.'s 56.1 ¶ 37.) *See Saleem*, 854 F.3d at 141 (concluding that such an agreement is "pertinent to the parties' beliefs about the nature of the relationship" between them) (quotation marks omitted).

b. Opportunity for Profit or Loss and Investment

As to the second factor, the worker's opportunity for profit or loss and their investment in the business, the Court looks to whether Plaintiff enjoys "control over essential determinants of

profits in the business." *Saleem*, 854 F.3d at 145 (quotation marks omitted). A worker's "large capital expenditures—as opposed to negligible items, or labor itself—are highly relevant to determining whether an individual is an employee or an independent contractor." *Id.* at 144 (quotation marks omitted). Here, Plaintiff made significant financial expenditures in his work with Defendants. He bought his initial route for $168,000 after evaluating whether it was profitable via a multi-week ride-along with Gecox, the former owner; he purchased a box truck for $45,000, which he uses alongside his personal vehicle; he sold his first territory and purchased his current route for $108,015.00. (Defs.' 56.1 ¶¶ 11–14, 25, 27, 61–62; Pl.'s 56.1 ¶¶ 11–14, 25, 27, 61–62.) These are the types of expenditures that represent "investment" in the business and suggest an independent contractor relationship. *See Xue v. Koenig*, No. 19-CV-7630, 2024 WL 1374954, at *3 (S.D.N.Y. Mar. 31, 2024) (differentiating between "income and tax benefits" of the plaintiff and investments on the scale of around $98,034 to $148,000 and investments in "vehicle acquisition, fuel, repair, maintenance, license, registration, and insurance fees, and tolls, parking, and tickets" (quotation marks omitted)), *motion to certify appeal denied*, 2025 WL 897046 (S.D.N.Y. Mar. 24, 2025).[10] They are also of the order of magnitude treated as

---

[10] Plaintiff argues that his investment in the business has to be compared directly to Defendants' investments. (Pl.'s Opp'n 15–16.) The in-circuit cases he cites, however, largely do not support this point. They instead suggest that where a plaintiff has made only a *negligible* investment, while most or all of the other expenses of operating the business are borne by the defendant, this factor favors the plaintiff. *Brock*, 840 F.2d at 1059 (affirming the district court's conclusion that the second factor did not favor the putative employer as the plaintiffs "had no opportunity for profit or loss and . . . their investment in the business was negligible"); *Williams v. TSU Glob. Servs. Inc.*, No. 18-CV-72, 2022 WL 4646446, at *6 (E.D.N.Y. Sept. 30, 2022) (not making any such comparison); *Black v. 7714 Ent., Corp.*, No. 21-CV-4829, 2022 WL 4229260, at *7 (E.D.N.Y. July 29, 2022) (concluding that a dancer did not significantly invest in the business where she had to pay house fees and the defendant club bore all other costs associated with operating and maintaining the establishment), *report and recommendation adopted*, 2022 WL 3643969 (E.D.N.Y. Aug. 24, 2022); *Campos v. Zopounidis*, No. 09-CV-1138, 2011 WL 2971298, at *6 (D. Conn. July 20, 2011) (concluding this factor favored the plaintiff

a large expenditure which is highly relevant in determining whether an individual is an independent contractor. *See id.*; *Saleem*, 854 F.3d at 144–46 (treating investments between $68,838 and $89,038 as substantial and suggestive of independent contractor status); *Chavez-Deremer*, 2026 WL 643271, at *15 (rejecting the conclusion that the plaintiffs made large expenditures where they made modest purchases such as "hard hats, safety gloves, safety vests, flashlights, and safety cones" and identifying past cases where annual investments on the order of hundreds of dollars were considered "negligible" for the purposes of this factor).

Further, Plaintiff uses his knowledge and skills to maximize profitability of the route. (*E.g.*, Defs.' 56.1 ¶¶ 48, 50 (describing Plaintiff structuring his route to maximize customer needs and avoiding extra fuel costs); Pl.'s 56.1 ¶¶ 48, 50; Defs.' 56.1 ¶¶ 59–60 (explaining that Plaintiff has developed skill in knowing the needs of customers, which allows him to maximize route profits); Pl.'s 56.1 ¶¶ 59–60.) *Saleem*, 854 F.3d at 144 (explaining that whether a putative employee can increase "profits . . . through their initiative, judgment, or foresight" are "attributes of the typical independent contractor") (alterations adopted and quotation marks omitted). As a result, the value of the route has grown to over $16,000 in average weekly sales. (Defs.' 56.1 ¶ 93; Pl.'s 56.1 ¶ 93.) Moreover, Plaintiff makes decisions about which shops to service based on their profitability and can set prices on the products for cash buyers (even though he has chosen not to). (Defs.' 56.1 ¶¶ 74–75, 78–79; Pl.'s 56.1 ¶¶ 74–75, 78–79.) *See Franze*, 826 F. App'x at 77 (noting, as support for independent contractor status, that "even if [the defendant] had the bargaining power with larger customers, [the plaintiffs] could have grown their sales

---

where the sole "investment" the plaintiff made in the business was supplying his vehicle, which he also used for personal purposes, whereas the defendants covered "all the other expenses of operating the business").

with smaller customers," and could have "modif[ied] their territories" to increase profits") (quotation marks omitted); *cf. Agerbrink*, 787 F. App'x at 26–27 (explaining there was a dispute of material fact as to the second factor where the plaintiff had *no* "power to negotiate a rate of pay" on her own).[11]

Together, these facts reflect the types of "significant investments in, and . . . ample opportunity to profit from or lose money on" a business which typify an independent contractor relationship. *Franze*, 826 F. App'x at 77; *cf. Gustafson v. Bell Atl. Corp.*, 171 F. Supp. 2d 311, 325 (S.D.N.Y. 2001) (concluding the second factor weighed in favor of employee status because, among other facts, the plaintiff "invested very little" as he "did not need to; the [c]ompany provided and maintained the car he drove and covered most of his driving expenses").[12]

The Court also considers whether "the business relationship had an exclusive nature that limited the purported employee's opportunity for profit from other sources of work." *Kinney v. Artist & Brand Agency LLC*, 2015 WL 10714080 at *15, (S.D.N.Y. Nov. 24, 2015). As already mentioned, Plaintiff was not under any exclusivity obligation, though admittedly there is nothing in the record to suggest that he ever earned compensation for deliveries made to customers on

---

[11] While Plaintiff urges that "[n]o amount of . . . skill could truly affect [his] profits," because Defendants set certain product prices and "it is not reasonably possible to complete a job more efficiently," (Pl.'s Opp'n 15), as already described, Plaintiff repeatedly acknowledged the choices he makes to maximize profits, and has not introduced evidence that would allow a reasonable juror to conclude that it was not reasonably possible to complete his job more efficiently.

[12] While Plaintiff received "financial assistance from" Snyders-Lance when he made the purchase, which might ordinarily weigh against a finding of independent contractor status, *Franze*, 826 F. App'x at 77, Plaintiff does not remain indebted to them, having made enough profit on his route and business transactions to pay off the entirety of not only his initial loan from Snyders-Lance, but also a later loan that he used to purchase the second route without financial assistance from any Defendant, (Defs.' 56.1 ¶¶ 11–28; Pl.'s 56.1 ¶¶ 11–28). Now that he owns the route outright, it represents an asset—and another opportunity for profit or loss by Plaintiff—that he can sell and whose financial benefits he alone would reap.

behalf of any competitor of Defendants. *See Cox*, 2023 WL 8648839, at *6 (considering, as part of determination that the plaintiff was an independent contractor, that plaintiff "was not under any exclusivity" agreement and "in one instance he earned remuneration for architectural plans he created and sold to one of the [d]efendant's customers with [d]efendants' consent"). It is plain that "[P]laintiff was 'free to engage in other employment,'" which "indicates that his position 'was that of an independent contractor.'" *Sellers*, 2014 WL 104682, at *6 (quoting *Legeno v. Douglas Elliman, LLC*, 311 F. App'x 403, 405 (2d Cir. 2009) (summary order)), *aff'd*, 592 F. App'x 45 (2d Cir. 2015) (summary order); *see also id.* at *7 ("[T]he dispositive point is that [the] plaintiff was, indeed, free to engage in other employment." (quotation marks omitted)).

In other circumstances, two of the factors identified by Plaintiff—that at one point he was required to form a corporation and that he acquired the products on consignment—might weigh against a finding of independent contractor status. *See Gustafson v. Bell Atl. Corp.*, 171 F. Supp. 2d 311, 325 (S.D.N.Y. 2001) (concluding that the second factor weighed in favor of finding that the plaintiff was an employee where he "formed a corporation at the request of and for the sole purpose of serving the [c]ompany," and that the "demands on [his] time essentially precluded him from seeking outside revenue"). But not so here. Plaintiff was not required to have his business incorporated—as evidenced by his own testimony that he never completed the incorporation process because he found it unnecessary and because Defendants did not care. (Belcastro Decl., Ex. 1, at 63:6–64:12 (Plaintiff explaining that he never finished the LLC formation process).) *Cf. Gustafson*, 171 F. Supp. 2d at 325 (concluding the plaintiff was an employee where, on the second factor, he was required to maintain his business being incorporated to drive on behalf of defendant). And multiple courts, in cases where individuals acquired product via similar consignment programs to the one described here, have concluded

that those individuals were nevertheless independent contractors. *See, e.g.*, *Carpenter*, 2023 WL 4552291; *Herman v. Express Sixty-Minutes Delivery Serv., Inc.*, 161 F.3d 299, 304 (5th Cir. 1998) (explaining that compensation weighed in favor of independent contractor status even where drivers were "compensated on a commission basis," because skilled drivers used their skill, initiative, and other business acumen to evaluate whether jobs were profitable and could choose how much they wanted to work).[13]

c. Degree of Skill and Independent Initiative

Third, the Court considers the degree of skill and independent initiative required to perform the work. While "courts in th[e] [Second] Circuit have generally found that the ability to drive vehicles and make deliveries is not the sort of 'specialized skill' that favors a finding of independent contractor status," the undisputed facts here suggest, as in *Franze*, that "operating [Plaintiff's] business[] required more than the ability to drive." *Franze*, 826 F. App'x at 78. Instead, his "success depended on [his] ability to increase sales, build customer relationships, effectively identify the popularity of different products, . . . and manage profits and losses." *Id.* (Defs.' 56.1 ¶¶ 48, 59–60, 74–75, 78–79; Pl.'s 56.1 ¶¶ 48, 59–60, 74–75, 78–79.) *See also Carpenter*, 2023 WL 4552291, at *10 (noting that while "it is generally accepted that driving is not itself a special skill," where "[the p]laintiffs testified that they leverage their communication skills, understanding of consumer habits, and efforts in servicing their stores to make their routes more profitable," the factor "favor[ed] independent contractor status" (alterations adopted, quotation marks omitted)); *Saleem*, 854 F.3d at 143–44 (concluding that drivers were

[13] As already mentioned, distributors retain the option to pay cash on delivery rather than use the consignment program, even though cash on delivery would require significant up-front expenses. (*See* Belcastro Decl., Ex. 1 at 256:13–257:25.)

independent contractors where putative employee drivers "possessed considerable independence in maximizing their income through a variety of means," including "deciding how best to obtain business from [the putative employer's] clients," to increase their profit while using initiative, judgment, and/or foresight, even if the putative employer exerted some control over fares and rolls of institutional clients); *contra Mbaye v. RCI Hosp. Holdings, Inc.*, No. 23-CV-2967, 2026 WL 279597, at *6 (S.D.N.Y. Feb. 3, 2026) ("Because the record indicates that [the p]laintiffs had little opportunity to impact the business's bottom line through their own skill and initiative, [the d]efendant has failed to establish that this factor weighs in favor of contractor, rather than an employment relationship for purposes of summary judgment."). The third factor, too, therefore weighs in favor of independent contractor status.

d. Permanence or Duration of the Working Relationship

The fourth factor is the permanence and duration of the working relationship. "[T]his factor is entitled to only modest weight in assessing employee status under the FLSA." *Benitez v. Valentino U.S.A., Inc.*, No. 19-CV-11463, 2024 WL 1347725, at *7 (S.D.N.Y. Mar. 29, 2024) (quotation marks omitted), *reconsideration denied*, 2024 WL 5145564 (S.D.N.Y. Dec. 17, 2024). The evidence here suggests that the duration of Plaintiff's relationship with Defendants is a long and open-ended one, but also of Plaintiff's choosing. (*See* Pl.'s 56.1 ¶¶ 40–41, 43; Defs.' 56.1 ¶¶ 40–41, 43; Makinen Decl., Ex. L, at 15.) Generally, long and open-ended relationships are suggestive of employee rather than independent contractor status. *See Kinney v. Artist & Brand Agency LLC*, 2015 WL 10714080, at *16 ("It is thus evident that the parties had a long-term, stable work relationship, of indefinite duration. These facts favor a finding that [the p]laintiff was working as an employee."); *Campos v. Zopounidis*, No. 09-CV-1138, 2011 WL 2971298, at *8 (D. Conn. July 20, 2011) ("[W]here there is no agreement dictating a particular term of work

and the worker puts in significant hours over a substantial period of time, courts have found this factor to weigh in favor of employment status.").

However, in *Franze*, an effectively identical arrangement was found to support the conclusion that plaintiffs were independent contractors. *Franze*, 826 F. App'x at 78. This was because the contract effectively obligated the defendants to continue to employ the plaintiffs absent some material breach of the parties' agreements. *Id.*; *see also Franze*, 2019 WL 2866168, at *10 ("[The] [p]laintiffs had the ability to sell their Distribution Agreements at any time, and [the] [d]efendants could terminate the Distribution Agreements only under limited circumstances. Hence, as with the cases above, [the] [p]laintiffs controlled the terms and *permanency* of their relationships." (emphasis in original)); *Saleem*, 854 F.3d at 141 ("While [the p]laintiffs could reassess their choice to affiliate with [the defendants] . . . and terminate the franchise agreements as they pleased, the terms of the agreements committed the [defendants] to maintaining them for substantial durations, or even indefinitely, absent [the p]laintiffs' breach of those terms.") (quotation marks omitted). Here, Plaintiff may terminate "with or without cause," so long as he provides 30 days' notice to Snyder's-Lance. (Makinen Decl., Ex. F at 9 (Dkt. No. 79-6).) In contrast, Snyder's-Lance may terminate upon the occurrence of certain conditions, such as Plaintiff's insolvency or fraudulent conduct, (*id.*); if Plaintiff breaches and does not cure within a five-day period, (*id.* at 9–10); or "for any just cause," including business or economic reasons, or if Snyder's-Lance "elects to terminate all the distributor agreements within the Distributor's area," so long as it provides 60 days' notice, (*id.* at 10). While this factor is a bit less clean cut than in *Franze*, it still appears that Plaintiff is essentially at liberty to quit at any point, while Defendant is restricted to termination in certain limited circumstances, including

"just cause," or breach of the New Distribution Agreement. Accordingly, as in *Franze* and *Saleem*, this factor likely favors independent contractor status.

e. Extent to which the Work is an Integral Part of the Employer's Business

Finally, the Court evaluates the extent to which Plaintiff's work is an integral part of Defendants' business. Defendants are food manufacturers and wholesalers, and Plaintiff is a distributor.[14] (Defs.' 56.1 ¶¶ 1–3, 6, 8; Pl.'s 56.1 ¶¶ 1–3, 6, 8 (not denying that Plaintiff works as a distributor).) While the delivery of food products may or may not be integral to a food manufacturer and wholesaler's business,[15] "the weight of this factor is diminished where the work performed easily is interchangeable with work by other drivers." *Thomas v. TXX Servs., Inc.*, No. 13-CV-2789, 2021 WL 1034677, at *10 (E.D.N.Y. Mar. 15, 2021); *see also Arena v. Plandome Taxi, Inc.*, No. 12-CV-1078, 2014 WL 1427907, at *6 (E.D.N.Y. Feb. 26, 2014) (explaining "[t]his factor provides little assistance in determining the employment relationship" where, although a driver's work was essential to the business, the driver was not

[14] The fact that Defendants manufacture the products differentiates this case from *Ansoumana v. Gristede's Operating Corp.*, 255 F. Supp. 2d 184 (S.D.N.Y. 2003), cited by Plaintiff, (Opp'n 22). In *Ansoumana*, the Defendant was a company that provided outsourced delivery services, so the plaintiff's work as a deliveryperson was plainly "integral" to that business. *See* 255 F. Supp. 2d at 186, 191–92.

[15] As is obvious, the products have to get to shelves *somehow*. But it's hard to tell whether this is an integral part of *Defendants'* business, as the retailers that purchase from Defendants equally need to obtain Defendants' products to stock their shelves, and might willingly take on obtaining and bringing the products to stores as part of *their* business. *Compare Franze*, 2019 WL 2866168, at *10 ("The [c]ourt finds that [the] [p]laintiffs' delivery services were an essential part of Bimbo's *distribution chain.* But Bimbo's business model, unlike for example Uber's business model, was not contingent on merely delivering baked goods to other retail consumers. Rather, Bimbo's primary business model was based on bakery product *manufacturing* and sales to end-market consumers." (emphasis in original)) *with Franze*, 826 F. App'x at 78 ("[W]e do not see how a model involving 'sales to end-market consumers' could function without distributors that carry a company's product to those consumers.")).

indispensable). So while this factor is somewhat equivocal, it is plain that Plaintiff's work could be taken over by another distributor, as he took it over from Gecox. (Defs.' 56.1 ¶¶ 11, 13–14; Pl.'s 56.1 ¶¶ 11, 13–14.) Accordingly, this factor "does not affect the overall balance of the *Superior Care* factors" in favor of independent contractor status. *Franze*, 826 F. App'x at 78.

Because four of the factors favor independent contractor status and the fifth is essentially neutral, the Court concludes that as a matter of law based on the undisputed facts, Plaintiff is properly categorized as an independent contractor. Accordingly, summary judgment is appropriate on Plaintiff's FLSA claim.

3. Employee Status under the NYLL

The Parties take the position that the analysis of employee status under the FLSA and the NYLL is the same. (*See* Defs.' Mem. 25–26 (arguing that the NYLL and FLSA analyses are effectively identical for the purposes of this Action); Pl.'s Opp'n 27 ("Plaintiff agrees with Defendants that the FLSA and NYLL statutes define 'employee' in 'nearly identical terms.' Because the NYLL standard is coextensive with the FLSA, the same factual and legal analysis . . .applies with equal force to [the] NYLL claims."); Reply 1–2 (noting that resolution of the FLSA claim "concededly . . . resolves the NYLL test").) While most New York State courts and federal courts within the Second Circuit agree, *see Yu v. Mask Pot, Inc.*, 241 N.Y.S.3d 323, 328 (App. Div. 2025) (interpreting the two identically on the basis that the NYLL "uses a nearly identical definition of the term employer as the FLSA" (quotation marks omitted)); *Vera v. The 6 Grp., LLC*, No. 21-CV-3696, 2025 WL 405816, at *5 (E.D.N.Y. Feb. 5, 2025) (addressing FLSA and NYLL employee status jointly on a motion for summary judgment, and collecting cases following the same approach), in *Franze* the Second Circuit analyzed additional, nonoverlapping factors under the NYLL analysis separately, 826 F. App'x at 79, and several district court

decisions note that "whether the tests for 'employer' status are the same under the FLSA and the NYLL has not been answered by the New York Court of Appeals," *Bayne v. NAPW, Inc.*, No. 18-CV-3591, 2024 WL 633164, at *11 (E.D.N.Y. Feb. 6, 2024), *report and recommendation adopted*, 2024 WL 1254197 (E.D.N.Y. Mar. 25, 2024); *see also Perez Perez v. Escobar Constr., Inc.*, No. 23-1240, 2024 WL 3594325, at *2 n.3 (2d Cir. July 31, 2024) (summary order) (assuming, without deciding, that the tests are identical, as the parties relied exclusively on cases interpreting the FLSA's definition of the term "employer"). Accordingly, the Court conducts the applicable NYLL analysis as well.

The NYLL "defines 'employer' as 'any person . . . employing any individual in any occupation, industry, trade, business or service,' or 'any individual acting as employer.'" *Yu*, 241 N.Y.S.3d at 328 (alteration adopted and quotation marks omitted). Courts applying New York law to determine whether an entity is a plaintiff's "employer" within the meaning of the NYLL consider the following factors: "whether the worker (1) worked at his own convenience, (2) was free to engage in other employment, (3) received fringe benefits, (4) was on the employer's payroll and (5) was on a fixed schedule." *Bynog v. Cipriani Grp., Inc.*, 802 N.E.2d 1090, 1093 (N.Y. 2003). "These factors, however, are not exhaustive: New York courts commonly consider additional factors," such as whether the worker is required to attend meetings, sign in and out, coordinate vacation time, or wear uniforms. *Hart v. Rick's Cabaret Int'l, Inc.*, 967 F. Supp. 2d 901, 923 (S.D.N.Y. 2013) (collecting state and federal court cases). And "notwithstanding *Bynog*'s enumeration of five factors, 'the critical determinant is the degree to which the purported employer exercises control in fact over the results produced or the means used to obtain them.'" *Id.* at 923–24 (quoting *Edwards v. Publishers Circulation Fulfillment, Inc.*, 268 F.R.D. 181, 184 (S.D.N.Y. 2010)).

For the same reasons already described above, there is no dispute of material fact as to whether Plaintiff "worked at his own convenience," "was free to engage in other employment," or worked on a "fixed schedule." Each of these factors supports the conclusion that Plaintiff was not Defendants' employee. *See Franze*, 826 F. App'x at 79 (reaching same conclusion on same basis). As to the third factor, it is undisputed that Defendants did not provide Plaintiff any fringe benefits. (Defs.' 56.1 ¶ 9; Pl.'s 56.1 ¶ 9 (not contesting that Plaintiff did not receive fringe benefits).) Regarding the fourth factor, while Plaintiff argues that he was effectively on "payroll" because he was paid on a regular basis based on the margin rates set by Defendants, it is undisputed that Plaintiff was not on Defendants' payroll, and that he filed his taxes as an independent contractor taking deductions for business expenses. (Defs.' 56.1 ¶¶ 9, 98–100; Pl.'s 56.1 ¶¶ 9, 98–100.) "Under New York law, 'the manner in which the relationship is treated for income tax purposes is certainly a significant consideration,' although 'it is generally not singularly dispositive.'" *Franze*, 826 F. App'x at 79 (quoting *Gagen v. Kipany Prods., Ltd.*, 812 N.Y.S.2d 689, 691 (App. Div. 2006)). In light of the undisputed fact that Plaintiff filed as an independent contractor and took "numerous deductions for business purposes" associated with that status, *Gagen*, 812 N.Y.S.2d at 691, and because Plaintiff has not pointed to any materials that would support a contrary conclusion beyond his characterization of his regular payments based on product margins as being on Defendants' "payroll," (*see* Pl.'s 56.1 ¶¶ 9, 98–100), the Court concludes that the fourth factor weighs in favor of independent contractor status here. Nor has Plaintiff pointed persuasively to any other facts in the materials before the Court that suggest that he is an "employee" within the meaning of the New York Labor Law. As all five factors identified in *Bynog* support the conclusion that Plaintiff was an independent contractor rather

than an employee of Defendants, the Court concludes that summary judgment in favor of Defendants on Plaintiff's NYLL claims is appropriate.

III. Conclusion

For the reasons set forth above, the Motion for Summary Judgment is granted. The Clerk of the Court is respectfully directed to terminate the pending Motion at Dkt. No. 77, enter judgment for Defendant, and close this case.

SO ORDERED.

Dated: September 29, 2026
White Plains, New York

KENNETH M. KARAS
United States District Judge